# No. 14,615.

## FARMERS RESERVOIR AND IRRIGATION COMPANY *v.* FULTON IRRIGATING DITCH COMPANY ET AL.
### (120 P. [2d] 196)

Decided November 10, 1941. Rehearing denied December 15, 1941.

Messrs. SMITH, BROCK, AKOLT & CAMPBELL, Mr. R. A. DICK, Messrs. BARTELS, BLOOD & BANCROFT, for plaintiff in error.

Messrs. TWITCHELL, CLARK & ECKLEY, Mr. WILLIAM R. KELLY, Mr. WILLIAM W. GAUNT, Mr. MALCOLM LINDSEY, Mr. GLENN G. SAUNDERS, Mr. THOMAS A. NIXON, for defendants in error.

· *En Banc.*

MR. JUSTICE YOUNG delivered the opinion of the court.

WHEN not herein mentioned by name, the parties will be designated as in the trial court.

The plaintiffs, defendants in error here, instituted an action in the district court of the City and County of Denver, against defendant, plaintiff in error, seeking to have declared abandoned defendant's water rights as evidenced by a decree for 226.98 second feet of water from the South Platte River for irrigation purposes, which was awarded to its predecessor in title in a water adjudication proceeding terminating in 1883, in which its priority was designated as No. 40, with date of appropriation as November 20, 1875. Plaintiffs are the owners of priority decrees on the stream junior to No. 40. To reverse the judgment of the district court granting the relief sought, defendant prosecutes a writ of error.

The record in the case consists of six volumes of transcribed testimony; the abstract thereof contains more than a thousand pages, and the exhibits are numerous. The issues, however, are not so complex as the magnitude of the record might indicate. Counsel for defendant, in their brief, discuss the issues raised by their assignments of error under five headings. These headings are pertinent statements of the issues presented by the assignments, and we shall deal with them in the opinion as discussed by counsel, but in the following order:

I. Demurrer to complaint.

II. Abandonment decree is not supported by sufficient evidence, irrespective of special defenses.

III. The effect of receivership proceedings involving Denver Reservoir Irrigation Company, The Farmers Reservoir and Irrigation Company, and other associate companies during the period from 1910 to 1922.

IV. Effect of the November 12, 1924, adjudication decree awarded to the Platte Valley Canal.

V. Estoppel to claim abandonment prior to March 17, 1909.

 We find no merit in the assignment of error challenging the trial court's action in overruling defendant's demurrer to the complaint based upon alleged misjoinder of parties plaintiff, misjoinder of causes of action and insufficiency of statement of facts. Plaintiffs were the owners of water rights junior to Priority No. 40. They did not ask to be decreed individually or collectively a right to the use of Priority No. 40, but merely to have that priority decreed to have been abandoned, in the benefit of which decree they would share by having increased the chances of having their junior priorities supplied. The plaintiffs did not seek, as we understand the complaint, to secure a prescriptive right to use any given quantity of water as of any particular priority date. They sought a common advantage in preventing the stream from being depleted by the resurrection of a water right which they assert has been abandoned, that would detrimentally affect them as juniors by reducing the number of occasions that water would be available to them.

In support of the contention that the complaint does not set forth sufficient facts to constitute a cause of action, counsel make the following statement: "A review of these authorities can lead to but one conclusion and that is, that only the person who has acquired a right *subsequent to the time of abandonment* can prevent a resumption of use of the abandoned appropriation." The following cases are cited as upholding the proposition: *Beaver Brook Reservoir & Canal Co. v. St. Vrain Reservoir & Fish Co.*, 6 Colo. App. 130, 49 Pac.

1066; *Conley v. Dyer,* 43 Colo. 22, 95 Pac. 304; *Drach, Executor v. Isola,* 48 Colo. 134, 109 Pac. 748; *Schwartz v. King,* 65 Colo. 48, 172 Pac. 1054; *Thomas v. Ball,* 66 Mont. 161, 213 Pac. 597. We do not find in them support for the assertion, nor do we think it can be supported by pertinent judicial pronouncements. All of the Colorado cases cited arose out of situations involving the doctrine of relation and a question as to whether an admittedly incomplete appropriation had been completed with due diligence. In the instant case the question does not involve the abandonment of an inchoate right which, because of lack of performance of a condition precedent, i.e., due diligence in completion, never became absolute, but is one relating to the abandonment of a right that at one time admittedly was absolute. Abandonment of a water right, as we have often announced, involves two elements, nonuser of the water and intent to abandon. When an abandonment occurs, the abandoned water augments the stream from which the diversion is made and reestablishes conditions as they would have existed had the abandoned right never come into existence and had it never been exercised. After abandonment becomes an accomplished fact, the attempt to exercise the abandoned right differs in no respect from an attempt by one who never had a right, to assert and exercise one nunc pro tunc, relating it back to a time such as to deprive those who have made subsequent valid appropriations, of water which they otherwise would receive. Certainly, one so deprived of water—and plaintiffs, under the allegations of their complaint and the theory of their action, were so deprived—is entitled to protection against such deprivation. Any one, or two or more so situated may institute an action to procure such protection, and if two or more join therein there is but one cause of action and no misjoinder of parties plaintiff.

The second assignment, which challenges the sufficiency of the evidence, requires a consideration of two

factors, namely, the law of abandonment and the evidence as it appears in the record.

■■ The law in Colorado on abandonment of water rights has been settled for many years. We do not understand that there is any difference between the parties to this cause as to what is the applicable law, they differ only on the matter of whether the facts are sufficient under the law to constitute abandonment. In a late case, *Commonwealth Irrigation Co. v. Rio Grande Canal Water Users' Ass'n,* 96 Colo. 478, 45 P. (2d) 622, we set forth the law of abandonment as follows: "Abandonment of a water appropriation 'consists in nonuse, coupled with an intention of the owner not to repossess himself of the use of the water.' *Arnold v. Roup,* 61 Colo. 316, 157 Pac. 206. The question of abandonment is one of intention. Nonuse alone is not sufficient. *White v. Nuckolls,* 49 Colo. 170, 112 Pac. 329. But where by clear and convincing evidence it is shown that for an unreasonable time available water has not been used, an intention to abandon may be inferred in the absence of proof of some fact or condition excusing such nonuse. *Green Valley Ditch Co. v. Frantz,* 54 Colo. 226, 129 Pac. 1006; *Northern Colorado Irrigation Co. v. Burlington Ditch, R. & L. Co.,* 74 Colo. 159, 219 Pac. 1071; *South Boulder Canon Ditch Co. v. Davidson Ditch & R. Co.,* 87 Colo. 391, 288 Pac. 177. And see *Sieber v. Frink,* 7 Colo. 148, 2 Pac. 901."

■ The testimony discloses that April 28, 1883, Evans Ditch No. 2, the ditch involved in this litigation, was given a decreed Priority No. 25 as of date October 5, 1871, for 177.07 feet, and on the same date it was awarded Priority No. 40 as of date November 20, 1875, for 226.98 second feet. It is this latter priority that the district court by its judgment declared abandoned. There is no dispute concerning Priority No. 25. At the time of the adjudication in 1883, Evans Ditch No. 2, and Priorities Nos. 25 and 40, were owned by the Platte Land Company, Ltd., an English company. In 1883, the title

to the ditch and water rights passed to the Platte Valley Irrigation Company, all of the stock of which was owned by the Platte Land Company, Ltd. The control of the ditch and its two priorities was in these two companies until 1909.

In 1909, a third corporation was organized, the Platte Valley Land Company. This new company, and the original English company, the Platte Land Company, Ltd., entered into a contract whereby the latter agreed to convey to the new company nine thousand acres of land for $125,000, payable in a series of installments. Upon payment of the final installment, the Platte Land Company, Ltd., was to transfer all of the stock of the Platte Valley Irrigation Company, which owned Evans Ditch No. 2 and its Priorities Nos. 25 and 40, to the Platte Valley Land Company. The Platte Valley Land Company, under the contract, was to recognize the sale by the Platte Valley Irrigation Company and the use by the purchasing farmers, of eighty-six water rights in Priority No. 25, each of such rights being for 1.44 second feet, which is deemed the requisite amount of water in that territory for the irrigation of eighty acres of land. This evidences the irrigation in 1909 of at least 6,880 acres by water diverted under Priority No. 25 through Evans Ditch No. 2. The contract further required the Platte Valley Land Company to clean the ditch, and enlarge the canal system of which it was a part, to Box Elder Creek, which is some ten or eleven miles east of the South Platte River.

May 28, 1909, the Denver Reservoir Company entered into a contract with the Platte Valley Land Company for the purchase, for $50,000, of all of the stock of the Platte Valley Irrigation Company, the then owner of Evans Ditch No. 2, and its Priority No. 25, subject to eighty-six outstanding water rights, and Priority No. 40, the subject of this litigation. The Denver Reservoir Company assumed all obligations of the Platte Valley Irrigation Company under its contract with the Platte

Valley Land Company. This, as will be observed, left the title to Evans Ditch No. 2 and its two priorities, still in the Platte Valley Irrigation Company. There appears to have been some community of interest between the Denver Reservoir Company and defendant, the Farmers Reservoir and Irrigation Company, and the purpose of the last mentioned contract was to make the Evans Ditch No. 2 a part of the latter company's irrigation system.

June 6, 1910, the Denver Reservoir Company and defendant, the Farmers Reservoir and Irrigation Company, were placed in receivership and remained therein until March 1, 1922, a period of twelve years. August 12, 1912, two years after the receivership began, a court order was entered whereby defendant, the Farmers Reservoir and Irrigation Company, received all of the stock of the Platte Valley Irrigation Company, the holder of the legal title to Evans Ditch No. 2 and its said priorities, and thus the Farmers Reservoir and Irrigation Company obtained indirect control—through the reservoir of course while the receivership lasted—of Evans Ditch No. 2, and its said priorities. While this situation existed, and on February 26, 1914, the Platte Valley Irrigation Company entered into a contract with the company holding all its stock, the Farmers Reservoir and Irrigation Company, defendant in this action, for the joint use by the two companies of the new segment of a ditch which shortly before had been constructed by the receiver for the latter company, extending from the headgate of Evans Ditch No. 2, to a bifurcation about ten miles from the headgate.

Nine years later, on May 1, 1923, and after the termination of the receivership, another contract was entered into between the Platte Valley Irrigation Company and the defendant company, providing for the transfer of Evans Ditch No. 2 and Priority No. 25 to the farmers using water under Priority No. 25, thereby permitting the mutualizing of the company. This was accomplished

by the Farmers Reservoir and Irrigation Company's transferring to the farmers all the stock of the Platte Valley Irrigation Company, then owned and held by the defendant company. The Platte Valley Irrigation Company also agreed to convey Priority No. 40 to the Farmers Reservoir and Irrigation Company, and agreed to the joint use of the ditch for the carrying of both priorities from the headgate to the bifurcation. Pursuant to this contract, the Platte Valley Irrigation Company conveyed by quitclaim deed, Priority No. 40 to the defendant, the Farmers Reservoir and Irrigation Company, which has since owned and controlled it. An operating agreement was concluded between the same parties giving the Platte Valley Irrigation Company a prior right to convey water under its Priority No. 25 from the headgate to the bifurcation, and giving the defendant company the right to convey water under its Priority No. 40, or any other which it might desire, to the bifurcation, at which point of separation the water diverted under Priority No. 25 continued through Evans Ditch No. 2 to its users, and that under Priority No. 40, and any other waters, were to be diverted to the Platte Valley Canal that extended to Milton Lake, ten miles easterly, and thence through the Gilmore Canal to lands under the Milton Lake project. This latter agreement superseded and nullified the agreement of 1914. From 1924, to the date of the commencement of this action, the two priorities, No. 25 and No. 40, were under separate control.

The foregoing rather involved contractual dealing with Priority No. 40 is set forth for the reason that defendant contends that it constitutes strong and continuing, if not conclusive, evidence of the lack of any intention to abandon Priority No. 40.

Thereafter, on November 12, 1924, a direct flow Priority, No. 77, as of date June 9, 1909, for 215.95 second feet, was decreed to the Farmers Reservoir and Irrigation Company, to be conveyed through the Platte Valley

Canal to Milton Lake, and thence to the lands under this project through the Gilmore Canal. In addition, a storage priority for 26,773 acre feet, as of date May 29, 1909, was decreed to Milton Lake, the water stored thereunder to be used for the irrigation of the same lands under that project. In the decree for direct flow diversion, it was recited in the findings that the Platte Valley Canal (the same ditch as Evans No. 2 from the headgate to the bifurcation ten miles below) had an estimated carrying capacity of 620 cubic feet per second.

The testimony further discloses that the Milton Lake project involves the irrigation of 14,000 acres of land. There was testimony by the president of the Farmers Reservoir and Irrigation Company, who had been officially connected therewith as early as 1907, and who had served as a director and secretary, to the effect that the demands of the farmers for irrigation under the Gilmore Canal, which is the canal from which the lands under the Milton Lake project receive their waters, both storage and direct flow, were "one foot of water for an acre of land [which] would be sufficient for the usual crops they raise down there."

If we assume, as plaintiff in error contends we should, that the decree of 1883 creates a presumption that at that time a valid appropriation for the 226.07 feet of water awarded by Priority No. 40 had been completed, that is, that it had been diverted and applied to a beneficial use: and if we assume further that the Court, in entering that decree, found the necessary elements of appropriation to exist in 1883, and their necessary concomitant, a ditch of such capacity that the diversion and application of water under Priority No. 40 could be made by means of it, then it would appear rather strange that the testimony should be so indefinite and uncertain as to what became of this water after it was diverted. It appears from the record that under the High Line Canal, with a decreed priority junior to that of No. 40, there has been a development of 30,000 acres of land.

On this basis, the 226 feet of No. 40 water was sufficient for a potential development of 11,000 acres, or approximately seventeen square miles. The testimony is clear that at an early date, though long after the appropriation was decreed, approximately 7,000 acres of land were being irrigated by the waters represented by Priority No. 25.

The records of the state engineer's office, copies of which are introduced in evidence, contain the water commissioner's reports over a period of many years, extending as far back as 1911. Plaintiffs' Exhibit "LLL", in particular, shows that during eleven of the years from 1911 to 1936, no diversion and use of water under Priority No. 40 was reported by the water commissioner, nor did he report that there was any shortage on calls for this priority. With the exception of 1925, when a considerable number of days on which there was a shortage of No. 40 water were noted by the water commissioner, these reports disclose only a very limited and sporadic use of water under this priority. Such partial use shown with few exceptions, some of which were explained by a "free river," was only for one, two or three days during the irrigating season. Furthermore, the testimony shows that there is no record, until 1935 when the demand was made which precipitated this action, that the headgates of any ditches having priority rights immediately junior to No. 40, as for example, the Fulton Ditch, with Priorities No. 43 and No. 51, and the Farmers Independent Ditch Company, with Priority No. 45, and the High Line Canal, with a priority right to 600 feet as of 1879, were ever shut down in order to supply Priority No. 40 with water. The witness Wall, called by plaintiffs, and who was general superintendent of Evans Ditch No. 2 from 1897 to 1907, a period of time which precedes that covered by the exhibit above mentioned, testified: "Never during my management was the second priority of 226 cubic feet, as of November 20, 1875, called upon; it was not necessary for our needs. No part

of it was ever used during my management. I know of no demand being made for Priority No. 40 of the Evans No. 2 Ditch, that is, the 1875 priority, until 1935."

Page 6 of Exhibit "RRRR", a copy of which is set out in the brief of defendants in error, which exhibit, while concededly not containing an absolutely accurate representation of the amount of No. 40 water used for the period of approximately twenty-six years, from 1910 to 1936, is, when considered in the light of the testimony in the record, a relatively accurate portrayal of the situation as disclosed by the testimony of the various witnesses. The exhibit shows that while the juniors mentioned, the Farmers Independent Ditch, the Fulton Ditch, and the High Line Canal, were using continuously vast quantities of water over a period of years, the owners of No. 40 water were using relatively so small a quantity, and that so sporadically, as to justify the conclusion that there was no real intention to continue the conditions of diversion and application to a beneficial use that were established, or that we assume were established, when the decree awarding the priority was entered. The use by juniors is proof positive of the availability of water under Priority No. 40. This practical nonuser of available water over this period of time by the owner of a concededly valuable and extensive water right, is not accompanied with a showing of any adequate reason or condition that would explain such nonuser. True, defendant attempts to explain it by the statement that No. 40 is necessary as "supplementary" or "complementary" to the Milton Lake storage priority of 1909, and the direct flow right of 1909 adjudicated for use on the lands under the Milton Lake project. The· Milton Lake project to irrigate 14,000 acres of land, was completed during the receivership hereinbefore mentioned, but the receiver, though engaged in developing water rights for the company, failed entirely to use Priority No. 40, capable in and of itself of reasonably developing 11,000 acres of land, and which it is now claimed

is necessary to complement, or supplement, the Milton Lake project in order to have an adequate supply. If Priority No. 40 was deemed a valid and subsisting right, the complete neglect of its owners to use the water decreed thereunder is most extraordinary. The failure to use it is understandable if it was not deemed to be a valid and subsisting right. Incidentally, the manner in which it is asserted it was used, as shown by the testimony of at least one witness, is contrary to the ordinary irrigation practice which is to use first, water under the senior priority to its full extent, and then to supplement, or complement, such water by the use of later junior priorities.

The testimony and the exhibits show that various written and verbal demands were made upon the water commissioner by those in control of Priority No. 40 to furnish water on that priority when it was available in the river, and that notwithstanding such demands, practically no water at all was turned into the ditches under that priority for a period of forty years, though during the same period juniors were receiving vast quantities.

Fritz Wattenberg, a director and president of the Consolidated Ditches, an association of ditches in District No. 2 where the Evans No. 2 is located, testified that for a period of twenty-five years prior to 1935, no ditch had ever been called upon to send down any water to supply Priority No. 40 of the Evans No. 2 Ditch. He testified further that in 1923 it was rumored that a demand for Priority No. 40 would be made and that he talked with Mr. Gaumer, the president of the Farmers Reservoir and Irrigation Company, who said: "Forget it," that he was "not going to do anything about it."

Witness Vollmer, a seventy-year old farmer, owner of an irrigated farm under the Farmers Independent Ditch, and a user of water conveyed thereby from 1904 to the date of trial, testified that since 1935 the Farmers Independent Ditch had been shut down to supply Priority No. 40, but that this had never occurred prior to 1935.

Witness Ogilvie farmed under the Fulton Ditch from 1902 to 1912, and from 1918 to 1936; was a director of the Fulton Ditch Company and superintendent of the ditch which has a priority junior to Priority No. 40. He testified that at no time during the eighteen years he was superintendent, was the Fulton Ditch shut down to supply a demand of No. 40 until 1935.

John E. Hayes, an engineer, a witness for the defendant, who had charge of constructing Milton Lake and its feeder and distribution system, testified that he did not recall that any other lands were irrigated with waters out of Evans No. 2 Ditch except those that were irrigated by the eighty-six water contracts that were to be filled from Priority No. 25, until after the Milton Lake project was completed in 1912. This was twenty-nine years after the entry of the 1883 decree awarding Priority No. 40, and thirty-four years after the appropriation on which it was based. We find no adequate explanation for the nonuser of such a valuable right for so long a period of time. The engineering testimony was conflicting. There was testimony that the waterway under a railway bridge through which Priority No. 40 was necessarily conveyed, was sufficient to carry the water decreed as No. 25 and No. 40, and there was other testimony that its capacity was insufficient. Assuming that the capacity was sufficient at the time the priorities were decreed, the question of what became of No. 40 water after it passed the bridge, and on what particular seventeen square miles of land which it was capable of developing it was applied, is, to say the least, obscure, so far as the record is concerned.

While the foregoing statement of the existing factual situation does not set forth all of the evidence, it is a sufficiently complete summary to indicate that the testimony was conflicting. It is the province of the trial court to resolve the issues where that is the situation presented. The various contracts with reference to Priority No. 40, the demands, verbal and written, for water

under that priority, and even the evidence of sporadic use of a portion of the water thereunder, are evidence of intention not to abandon, but the continued practical nonuser of a water right of great value for a period of forty years, with no evidence other than the presumption which may attach by reason of the adjudication of the priority that water was ever diverted and applied to a beneficial use to any appreciable extent, is evidence of abandonment, and when not reasonably explained is sufficient to authorize an inference that the nonuser was with intent to abandon. Those who intend to keep and maintain a water right such as this, the value of which is only in its use, do not neglect for forty years to make use of the right so that they may utilize its value. The fact that they have neglected to use it in this case, although at the same time contending that the owner of the right had lands to which it could be applied, is evidence that they did not intend to keep and maintain it, but rather to abandon it. There was testimony to support the trial court's finding of abandonment, and the evidence on that issue being conflicting, we are not at liberty to disturb its conclusion.

Defendant assigns as error the fact that evidence of nonuser during the twelve-year period of receivership hereinbefore mentioned was admitted, and considered by the trial court, and its counsel contend that one cannot be held by implication from conduct, to have abandoned a valuable right when it was beyond his power expressly to relinquish it. Abstractly, the statement is correct. The application here made is that a receiver is without authority to surrender a property right which he holds in trust, without order of court, and that he cannot, therefore, forfeit it by his neglect. The error in this argument is that in the attempted application to the situation before us it is assumed that the nonuser, during the receivership, must be considered to be the result of neglect. As we have pointed out, such is not the case. Nonuser by the receiver appointed to

conserve and protect the assets of his trust is equally consistent, first, with the testimony of defendant's witness Hayes, that water under Priority No. 40 never, to his knowledge, had been used prior to the development of the Milton Lake project in 1912; and, second with a recognition of the fact that the right had been abandoned when the receivership began in 1910.

It is worthy of note that the legal title to Priority No. 40 was not in either of the two companies in receivership, but in a third company the stock of which was held for the last ten years of the receivership, by o�define of the companies in receivership. It is hardly probable that a receiver finding himself in possession of the entire stock of a water company, and thus able to control it, would not make some inquiry concerning its assets and their value. Neither is it probable that for ten years nothing was done by the receiver toward using a water right potentially capable of irrigating seventeen square miles of land, while at the same time he was developing the Milton Lake project to irrigate the same land now requiring, as defendant contends, the water sought to be obtained under Priority No. 40 as a supplementary, or complementary, source for adequate irrigation. The evidence was competent as tending to show a recognition of an abandonment of the rights under Priority No. 40 prior to the receivership. There was no error in its admission and consideration.

Defendant assigns error based on the court's refusal to accept as res judicata, that Evans Ditch No. 2 was of sufficient capacity to carry the appropriation awarded by Priority No. 40, on June 9, 1909, because, it is said, of necessity the Court, in the adjudication proceedings, must have found that it did have such capacity when decrees were awarded to the Platte Valley Canal based upon enlargements of Evans Ditch No. 2 on August 2, 1918, and November 12, 1924. If the decree by which Priority No. 40 was awarded was being attacked, this contention might possess merit, but the validity of

that decree is not here involved. A proceeding to procure a decree of abandonment assumes the prior existence of the right which it is sought to have declared abandoned. In this case it is assumed that a diversion through a canal of sufficient capacity to carry the decreed water, and application of the water to a beneficial use, had occurred when the decree awarding Priority No. 40 was entered in 1883. Similarly, such an assumption must be made as to the other later decree. These assumptions, however, do not preclude one from asserting abandonment a year or a half century subsequent to the date of the decree, and showing that those who were on the ground and familiar with the situation never saw the water applied, thus tending to establish, *not that it never was used*, but that it had ceased to be used. Neither does it prevent one so claiming, from showing a year or half century later, as a physical fact, that the ditch at a particular time was not carrying, or would not carry more than a given quantity of water, *not for the purpose of showing that the amount of water was never diverted*, but to show that it had ceased to be used.

In *Northern Colorado Irrigation Co. v. Burlington Ditch, Reservoir and Land Co.*, 74 Colo. 159, 219 Pac. 1071, an abandonment case, we used the following language (page 160):

"We think it [the record] clearly shows that more than 600 cubic feet of water was available, that it was not used, that the ditch would not carry it, and that plaintiff in error did not act upon the theory that it could be delivered, all for a period of approximately thirty years. Whether these facts were conclusive on the question of abandonment need not be determined. To say the least they raised a very strong presumption thereof, which the trial court was fully justified in finding was not rebutted by the claims and demands which plaintiff in error says it made from time to time."

The physical capacity of a ditch may fluctuate, which the record here indicates, due to one or more of

many factors, which it is unnecessary to enumerate. For this reason, if for no other, the determination of capacity based on a physical condition present the day a decree is entered, is not an adjudication that such condition will always continue, and if it does not, of course the capacity will not remain as fixed by the decree. We find no merit in the plaintiffs' defense of res judicata as to the issues concerning capacity here involved.

 Defendant contends that the Platte Valley Irrigation Company, the then owner of Priority No. 40, the Fulton Irrigating Ditch Company and the Farmers Independent Ditch Company, are estopped from claiming abandonment by reason of the fact that in 1909 they joined as petitioners in seeking a reargument and review of proceedings in the district court of the City and County of Denver for the adjudication of priorities in Big Dry Creek, an alleged tributary of the South Platte River. The basis of this petition was that an adjudication of rights on Big Dry Creek permitting diversion as of a date subsequent to 1883, the date of the adjudications of the priorities to the petitioners' ditches, would prevent water that theretofore had flowed down the Big Dry Creek into the South Platte River, thus augmenting its flow, from reaching that stream, and that ditches senior to those of petitioners, below the petitioners' headgates and below the mouth of Big Dry Creek, would therefore make more frequent calls to shut down petitioners' ditches to supply senior requirements. In this petition it was alleged that decreed Priority No. 40 was valid and existing and that the water diverted thereunder was used for irrigation purposes. It is contended that by reason of this allegation in that case, that the Fulton Irrigating Ditch Company and the Farmers Independent Ditch Company are estopped now as against their co-petitioner in that case, the Farmers Reservoir and Irrigation Company, the present owner of Priority No. 40, from asserting its abandonment prior to the date of filing such petition. The case upon which counsel

rely as supporting their contention of estoppel was appealed to this court. It is entitled, *In re German Ditch & Reservoir Company*, and reported in 56 Colo. 252, 139 Pac. 2. It should be noted that that case was an adjudication proceeding in which the matter of abandonment of any water rights theretofore decreed was not and could not become an issue. On the factual side, it should be noted further that there was then no reason why the Platte Valley Irrigation Company, the predecessor in interest of the Farmers Reservoir and Irrigation Company, was not a proper party to the proceedings had it been the owner of only Priority No. 25, concerning which there is here no question of abandonment, as well as the alleged owner of Priority No. 40, the abandonment of which is here in issue. The record before us is utterly devoid of any evidence of action to the detriment of the respondents, predicated on the allegations contained in the petition above mentioned. What was said by us in *Lower Latham Ditch Co. v. Louden Irrigating Canal Co.*, 27 Colo. 267, 60 Pac. 629, is pertinent here. The statement is as follows:

"We will not attempt to mention all the elements of estoppel as sought to be established in this case, it being sufficient for the purposes of this action to state that before the conduct of one party will create an estoppel in favor of another with respect to the title of the subject-matter of dispute between them, it must appear that the party against whom such estoppel is sought to be established was apprised of the true state of his own title; that by such conduct he intended to deceive or thereby was guilty of such negligence as to amount to a fraud; that the other was not only destitute of all knowledge regarding the true state of his title, but of the means of acquiring such knowledge. There must be some degree of turpitude in the conduct of a party before a court of equity will estop him from the assertion of his title, when the effect of the estoppel is to forfeit his property, and transfer its enjoyment to another.

*Boggs v. Merced M. Co.,* 14 Cal. 279; 1 Story's Eq. Jur. §391; 2 Pomeroy's Eq. Jur. §§807, 817; *Water Supply & Storage Co. v. Tenney,* 24 Colo. 344." We find no merit in the defense of alleged estoppel.

Judgment affirmed.

MR. CHIEF JUSTICE FRANCIS E. BOUCK not participating.