## No. 24005.

THE CITY AND COUNTY OF DENVER, A COLORADO MUNICIPAL CORPORATION, ACTING BY AND THROUGH AND FOR THE USE OF ITS BOARD OF WATER COMMISSIONERS *v.* ALFRED C. JUST AND GLADYS S. JUST.

(487 P.2d 367)

Decided July 6, 1971. Rehearing denied August 9, 1971.

SAUNDERS, DICKSON, SNYDER & ROSS, JACK F. ROSS, GEORGE L. ZOELLNER, J. J. PETROCK, for plaintiff in error.

JON K. MULFORD, for defendants in error.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

THE defendants in error, called the Justs, brought an action against Denver and others to quiet the title to a 7/25ths interest in a decree of 25.22 cubic feet of water per second of time (cfs) to the Crooked Creek Supply Ditch out of St. Louis Creek in Grand County. The Justs prevailed, and Denver sued out this writ of error. We reverse.

.· One Ralph Ord obtained the decree for the full 25.22 cfs on August 3, 1911. On November 12, 1914, Ord executed a quitclaim deed, which was recorded later that month in the office of the county clerk and re-

corder. This deed provided in part as follows:

"Whereas the legal title to The Crooked Creek Supply Ditch stands upon the record in the name of Ralph Ord, and

"Whereas, the ownership of said ditch is divided into twenty-five shares or parts owned by the following persons and in proportions as follows, towit: George Eastom, 7 shares; Gus Johnston, 1 share; Nels Nelson, 1 share; Charles Jacobson, 1 share; Robert Lyon, 3 shares; John Daxton, 1 share; W. E. Ingrim, 1½ shares; F. F. Collidge, 1½ shares; Fred Feltch, 5 shares, and Ralph Ord, 3 shares.

"Now therefore, for the purpose of establishing and determining the ownership of said ditch, both in law and in equity, I, Ralph Ord, of the City and County of Denver, for good, valid and valuable consideration have remised, released and forever Quit Claimed and by these presents do remise, release, and forever Quit Claim unto the said [persons above named], their heirs and assigns forever, twenty-two shares or parts and all right, title, interest, claim and demand I have in and to said twenty-two shares or parts in the following described ditch and water right, towit: The Crooked Creek Supply Ditch . . .

"To have and to hold the same unto the said parties, their heirs and assigns, to their only proper use and behoof forever, in the proportions above particularly set out."

The Justs came to the community about 34 years prior to trial, and for the first ten years leased a ranch which was irrigated with water represented by two "shares" in the Crooked Creek Supply Ditch. They then purchased the property, including the water and ditch rights, and still owned it at the time of trial.

The Ord quitclaim deed transferred seven "shares" to George Eastom. The Justs testified that they had never seen Mr. Eastom; that during the 34-year period he did not reside in the particular area; and that during that

time he did not take any water out of the Crooked Creek Supply Ditch. There was no evidence that Eastom at any time had used any water from the ditch.

Mrs. Just testified that during the thirty-four year period prior to the trial of the action owners of seventeen "shares" constituted all the users out of the ditch. Apparently, there also had dropped out of sight another grantee who obtained one "share" by the Ord deed, or his successor. In the 1950s Denver acquired twelve of the seventeen "shares," and still holds them.

The Justs discovered that George Eastom had died and in 1963 they obtained a deed for seven "shares" from the executrix and sole devisee of his estate. The action under review here was brought to quiet the title to the property acquired by that deed. One of the issues presented is whether this deed vested title. In the light of the disposition that we make of this case, we do not pass upon this point.

Based upon amply sufficient evidence, which was not contradicted, the trial court found that those actually using water from the ditch diverted and used the full 25.22 cfs over the years "whenever it was available, and diverted as much as they could at other times, subject to rights of senior appropriators."

As stated, the complaint sought only to quiet title to the seven "shares" acquired under the executrix's deed. The defendants in the action were users of the water adjudicated to the ditch or their predecessors in title. It is of some significance that junior appropriators on the stream were not joined as parties defendant. In its answer Denver denied many of the allegations in the complaint and, as its only other defense, pled that the water involved had been abandoned. At the conclusion of the trial Denver moved to amend its answer to plead adverse possession. The court denied this motion.

The trial court found that any abandonment would be only to the stream, but that abandonment had not been proven. The basis of the determination of the trial

court is disclosed by the following conclusion of law made by it:

"Even though the owner of a water right *may* not have used the full quantity of water to which his share entitled him, if the excess water is used by the other owners in the ditch, there is no abandonment of the right. See Cache La Poudre Irrigation Company case 25 Colo. 144, 53 Pac. 318."

In the cited case (*Cache La Poudre Irrigating Co. v. Larimer and Weld Reservoir Co.*), a mutual ditch company was involved, and it was sought to enjoin a person who had purchased stock in the company from transporting water represented by such stock to lands not previously irrigated by waters from the mutual ditch company ditch. The following statements were made by Chief Justice Campbell:

"[The stockholders in the mutual ditch company] might and in this case did, apportion the water among themselves. *White v. Highline Co.*, 22 Colo. 191. They could not waste it, or divert more than their necessities required; but junior appropriators are not concerned with the method of apportionment adopted by those entitled to its use, so long as the latter had a necessity for it, and actually used it, and diverted no more than the decreed priority. If one consumer did not need, or use, all that his stock entitled him to; or if, by sale of a portion of his lands, his necessity was less, or, as expressed by counsel, if he owned more water than land, he might lawfully sell the excess of water, or lease it, or permit his cotenants to use it, before any subsequent appropriation attached thereto, and of this junior appropriators may not complain.

"One tenant in common may preserve the entire estate held in common. This doctrine is applicable where the common estate is a water right, so long as the tenant in common has both the necessity for the use, and actually uses the water for a beneficial purpose. The extent to which the right may be preserved, of course, depends

upon the amount so used, coupled with the necessity. *Meagher v. Hardenbrook,* 11 Mont. 385."

It is apparent that the trial court here found that the remaining users in the ditch held the entire adjudicated priority for 25.22 cfs as tenants in common, and following *Cache La Poudre Irrigation Co.,* applied the rule that use of an entire property right by less than all tenants in common thereof prevents abandonment by the non-using tenants in common.

We make no comment as to whether any statement in *Cache La Poudre Irrigating Co.* has been or should be modified. We do not have a mutual ditch company involved in the instant matter, and we hold that the users of the water from the Crooked Creek Supply Ditch were not tenants in common of the water rights.

Excluding consideration of stockholders in mutual ditch companies, ordinarily, for persons to be tenants in common in an irrigation water right, they must be owners as tenants in common of the lands upon which the water is used. *City of Telluride v. Davis,* 33 Colo. 355, 80 P. 1051 (1905), which is cited in *Hallet v. Carpenter,* 37 Colo. 30, 86 P. 317 (1906). *See Norman v. Corbley,* 32 Mont. 195, 79 P. 1059 (1905), which is cited in *City of Telluride.*

Assuming *arguendo* that it may be possible for persons who are not owners of lands as tenants in common to place priorities to irrigation water in cotenancy, it is our determination that this was not accomplished by the Ord deed. It is apparent that the recital in that deed that "the ownership of said ditch is divided into twenty-five shares or parts owned by the following persons and in proportions as follows," was not an attempt to place undivided interests in cotenancy. Rather, it is patent from this deed that the grantor, by the use of the terms "share" or "shares," was designating the amount of water from the ditch to which each grantee was entitled for his land. In other words, a person to whom one share was transferred acquired 1/25ths of

the water legally flowing in the ditch at any particular time for the irrigation of his land. If at a certain time 25 cfs legally was flowing in the ditch, that person was entitled to one cfs of that water.

This is vastly different from the usual situation of a mutual ditch company. Generally, a mutual ditch company has obtained the decree to all the water flowing in its ditch. The stockholders are entitled to withdraw water from the ditch in proportion to their ownership of the stock of the corporation, which stock usually is freely transferrable. Here, there was no attempt to transfer the ownership of the water to the ditch or to a community of persons owning the ditch. To repeat, a designated fractional amount of a water priority was conveyed to each grantee for use on his land, and he was the owner of 100% of that designated fractional priority.

■ Because of our conclusion as to the nature of the ownership of these water rights, we must depart from the conclusion of the trial court that the use by one user in the ditch of water to which another user was entitled prevents abandonment by the second user. In contrast, under the undisputed facts in this case we hold as a matter of law that the 7/25ths interest conveyed to George Eastom was abandoned. As already mentioned the holders of this water right made no use of it for at least 34 years, and there was not a shred of evidence to negate abandonment. In *Allen v. Swadley,* 46 Colo. 544, 105 P. 1097 (1909), there was a failure for 32 years to use a certain interest in the water of a ditch. There was some conflict in the testimony, but the trial court found that the right had been abandoned. This was affirmed. There is no conflict in the evidence here, and we can properly rule that there was abandonment. In fact, we must so rule.

Denver has argued unconvincingly that George Eastom abandoned the water to the other users in the ditch. If such a type of abandonment is possible, which we doubt,

at least it would have to be supported by some evidence. Any such evidence is completely absent here. As the trial court mentioned, when water is abandoned it is abandoned to the stream. *Farmers Reservoir and Irrigation Co. v. Fulton Irrigating Ditch Co.,* 108 Colo. 482, 120 P.2d 196 (1941); and *North Boulder Farmers' Ditch Co. v. Leggett Ditch and Reservoir Co.,* 63 Colo. 522, 168 P. 742 (1917).

 As already noted, Denver's defenses in its answer were to put the plaintiffs on their proof and to show that the water had been abandoned. It did not plead adverse possession and, when it attempted to amend its answer at the conclusion of the trial, the court properly, acting within its discretion, denied the motion. *Quandary Land Development Co. v. Porter,* 159 Colo. 8, 408 P.2d 978 (1965). As a result, any questions involving rights by adverse user were not before the trial court and they are not before us.

It well may be that further litigation will follow to determine whether the remaining users of the ditch obtained title to all or part of the 7/25ths interest by adverse possession. Conceivably, these users might have acquired title by adverse possession prior to the abandonment thereof by George Eastom. We regard this as improbable, but such acquisition of title prior to abandonment would not necessarily be inconsistent with this opinion. If title was acquired by adverse user, it occurs to us that it would be much more probable to have been obtained after abandonment by adverse possession against junior appropriators on the stream, *i.e.,* the remaining users might have adversely used the 7/25ths interest, by claiming it as a part of the adjudicated priority.

 The remaining issue to be decided by us is whether Denver timely filed its motion for new trial. The findings of fact, conclusions of law and decree bear a date of February 26, 1968, and a filing stamp dated March 4, 1968. The record contains a "Motion for Clari-

fication of Record and Determination of Time for Filing Motion for New Trial" which shows that it was received by the trial judge on March 13, 1968. Under date of March 14, 1968, the judge entered an order directing that the judgment theretofore signed be entered by the clerk of the court in the judgment docket book pursuant to R.C.P. 58 (a) and 79 (a). This order further provided that pursuant to the motion Denver was granted until March 27, 1968 within which to file its motion for new trial. The motion for new trial was filed on March 26, 1968.

The Justs contend that, unless the period of time was extended during the ten-day period following February 26, 1968, Denver lost its right of review. The Justs cite *Niles v. Shinkle,* 119 Colo. 458, 204 P.2d 1077 (1949), as authority for the proposition that the failure to file a motion for new trial within the time provided by law or within the extended period fixed by the court for so doing is fatal to the right of review; and with this we agree. On the proposition that the decree was "entered" on February 26, 1968 they cite *Jones v. Galbasini,* 134 Colo. 64, 299 P.2d 503 (1956), and *King v. Williams,* 131 Colo. 286, 281 P.2d 163 (1955). These cases relate to the time to sue out a writ of error and to the time at which a judgment becomes final. They have no applicability to the problem at hand. Other cases cited by the Justs are not in point.

With respect to the problem here involved, our present Rules of Civil Procedure are the same as those which were in effect in 1968. Therefore, we give citations to the present rules. C.R.C.P. 79 (d) provides that the clerk shall keep a judgment docket. C.R.C.P. 58 (a) (3) provides that the notation in the judgment docket of a judgment such as is involved here "constitutes the entry of the judgment. . . ." C.R.C.P. 59 (b) provides that a "motion for new trial shall be filed not later than 10 days after the entry of the judgment, or such further time as may be allowed by the court. . . ." This judgment was

not "entered" until after the court entered its order on March 14, 1968. Therefore, the court's extension of time for filing the motion for new trial was made within the permissible period.

. The judgment is reversed and the cause remanded with directions that the decree be vacated and judgment entered that the Justs take nothing under their complaint.

MR. CHIEF JUSTICE PRINGLE not participating.