**SOUTHEASTERN COLORADO WATER CONSERVANCY DISTRICT, Complainant–Appellee,**

v.

**TWIN LAKES ASSOCIATES, INC. and Dennis O'Neill, Respondents–Appellants,**

**and**

**Cache Creek Mining Trust, Respondent,**

**and**

**Concerning the Application for Water Rights of Dennis O'Neill and Twin Lakes Associates, Inc. in Lake and Chaffee Counties.**

**Dennis O'Neill and Twin Lakes Associates, Inc., Applicants–Appellants.**

**No. 87SA243.**

Supreme Court of Colorado, En Banc.

March 13, 1989.

any diversions from these ditches based on the cancelled water rights. We affirm the judgment of the water court.

Fairfield and Woods, P.C., Howard Holme, Kevin B. Pratt, Stephen H. Leonhardt, Denver, for complainant-appellee Southeastern Colorado Water Conservancy Dist.

Carlson, Hammond & Paddock, John U. Carlson, Tod J. Smith, Denver, for complainant-appellee Twin Lakes Reservoir and Canal Co. and Bd. of Water Works of Pueblo.

Peterson & Fonda, William Mattoon, Pueblo, for complainant-appellee Bd. of Water Works of Pueblo.

Anderson, Johnson & Gianunzio, Gregory L. Johnson, Mark T. Pifher, Colorado Springs, for complainant-appellee City of Colorado Springs.

Robert N. Miller, U.S. Atty., John R. Hill, Jr., Denver, for complainant-appellee U.S.

Musick and Cope, Joseph A. Cope, Boulder, for respondents-appellants, Twin Lakes Associates, Inc. and Dennis O'Neill.

No appearance for respondent Cache Creek Mining Trust.

QUINN, Chief Justice.

Twin Lakes Associates, Inc. and Dennis O'Neill appeal from a judgment determining six water rights decreed in 1912 to the Cache Creek, Arlington, and Clear Creek Ditches to have been abandoned. The water court, after concluding that the presumption of abandonment arising from an unreasonably long period of nonuse had not been rebutted, ruled all six water rights to have been abandoned, cancelled the water rights decreed in 1912 to the three ditches, and permanently enjoined

## I.

This case began on December 3, 1984, when Southeastern Colorado Water Conservancy District (Southeastern) filed a protest to the Division Engineer's 1984 abandonment list on the basis that the engineer had improperly omitted from the list six water rights decreed in 1912 to the Cache Creek, Arlington, and Clear Creek Ditches. Cache Creek Mining Trust[1] and O'Neill, who is the president, chairman of the board of directors, principal owner, and authorized agent of Twin Lakes Associates, filed statements of opposition and a motion to dismiss. By stipulation of the parties, it was agreed that Southeastern would be permitted to file a complaint for a determination of abandonment. The water court entered an order on April 30, 1985, confirming the stipulation and ruled that Southeastern would bear the burden of proving abandonment.

Southeastern filed its complaint on May 22, 1985, for determination of abandonment with respect to the six water rights decreed in 1912 to the Clear Creek, Arlington, and Cache Creek Ditches. The complaint alleged that the six water rights had been abandoned due to periods of nonuse of ten years or more and requested that the rights be cancelled and that any further diversions based on the cancelled water rights be permanently enjoined. Twin Lakes Associates, O'Neill, and Cache Creek Mining Trust filed answers denying that the water rights had been abandoned.

On April 29, 1986, Twin Lakes Associates and O'Neill filed an application for a determination with respect to a change of water right, in which they requested a change from the original placer mining use to a variety of uses in connection with a ski area development. Statements of opposi-

---

1. Shortly before the commencement of trial Cache Creek Mining Trust conveyed its interest in the land and any interest in the water rights in issue to O'Neill, but because it retained a security interest in the property conveyed it participated in the trial. However, Cache Creek Mining Trust did not enter an appearance in the appeal of this case.

tion to the change were filed by Southeastern and various other parties including Twin Lakes Reservoir and Canal Company, the Board of Water Works of Pueblo, the City of Colorado Springs, and the United States of America (hereinafter collectively referred to as Southeastern).[2]

By agreement of the parties, the water court consolidated the application for a determination with respect to a change of water right with the complaint for a determination of abandonment, but separated the claims for trial and scheduled the trial of the abandonment claim first. We now summarize the evidence on the abandonment claim which was tried on several days in 1986 and 1987.

There is no challenge in this case to the present ownership interest of Twin Lakes Associates and O'Neill in the properties involving the six water rights originally decreed in 1912 to the Clear Creek, Arlington, and Cache Creek Ditches, nor is there any dispute over the original appropriation of those water rights. Twin Lakes Placers, Limited (Twin Lakes Placers), a company incorporated in Great Britain and licensed to do business in Colorado, maintained extensive placer mining holdings in Colorado in the early part of this century. In 1912 the majority of its holdings were in Chaffee and Lake Counties in the area commonly known as Cache Creek Park. The holdings of Twin Lakes Placers included seventeen placers in Chaffee County, two in Lake County, and one that straddled the boundary between the two counties. The water rights in issue were appropriated prior to the turn of the century and were decreed on March 18, 1912. The decree described the sources of the six water rights as natural streams tributary to the Arkansas River, and awarded water rights to the Cache Creek, Arlington, and Clear Creek Ditches

for placer mining uses in connection with the placer mines belonging to Twin Lakes Placers in Lake and Chaffee Counties.[3]

Twin Lakes Placers used the decreed water rights for large-scale hydraulic gold mining. In 1909 the cities of Pueblo and Canon City, located downstream from the mining operations, filed a complaint in the District Court of Fremont County seeking to enjoin Twin Lakes Placers from hydraulic mining. The cities claimed that the placer mines had washed away large portions of hillsides containing deposits of glacial flour, which consisted of finely ground particles that render water unfit for human consumption, and that effluent from the mines had resulted in polluting the Arkansas River. Twin Lakes Placers acknowledged in its answer that the entry of the injunctive decree sought by Pueblo and Canon City would destroy the value of its property and water rights. On June 24, 1912, the district court enjoined Twin Lakes Placers "from any activity by which placer mine tailings or debris might be discharged, placed or conveyed into the Arkansas River." Upon the entry of the injunction Twin Lakes Placers never sought a modification of the decree, as it was authorized to do, and ceased its mining operations. Its license to do business in Colorado was suspended by the Secretary of State on September 27, 1915.

In 1912 the placer parcels of Twin Lakes Placers were encumbered with statutory liens arising from unpaid property taxes. In the latter part of the year Lake and Chaffee Counties listed the placer parcels, with one exception, for tax sale, and the one remaining parcel was listed for tax sale in 1915. Twin Lakes Placers failed to redeem any of the parcels, and the properties were subsequently conveyed by tax deed to purchasers of the individual parcels.

**2.** In addition to the parties mentioned in the text, several others filed statements of opposition but did not participate in the trial on the issue of abandonment.

**3.** The six water rights awarded in the 1912 decree were as follows: two water rights to the Cache Creek Ditch (priority 13 for 25 cubic feet per second appropriated on November 8, 1861, and priority 14 for 15 cubic feet per second

appropriated on January 1, 1862); three rights to the Arlington Ditch (priority 15 for 25 cubic feet per second appropriated on January 1, 1862, priority 17 for 15 cubic feet per second appropriated on January 1, 1873, and priority 19 for 10 cubic feet per second appropriated on April 19, 1897); and one right to the Clear Creek Ditch (priority 18 for 50 cubic feet per second appropriated on October 24, 1882).

The properties which originally benefited from the Twin Lakes Placers water rights changed hands several times after the 1912 injunction. Various documents were admitted into evidence showing numerous deeds and conveyances, leases and options, and quiet title proceedings concerning the properties. Some of these documents contained a description of water or ditch rights while others did not.

During Southeastern's case in chief several witnesses—a district ranger and a land staff officer for the United States Forest Service, a division engineer for the State of Colorado, a division manager for the Pueblo Board of Water Works, local residents and visitors, a consulting engineer, and a cultural anthropologist/archaeologist—testified concerning the use of the subject water rights in the years following the 1912 injunction. The testimony indicated that little placer mining has taken place in Cache Creek Park since the early 1920s, with some use having been made of the Clear Creek and the Arlington Ditches up until that time. Since the early 1920s these ditches and the north branch of the Cache Creek Ditch have become largely unusable due to landslides, erosion, growth of trees in the ditches, and the collapse of wooden flumes and a tunnel. With the exception of some recent repairs and improvements, there was virtually no effort to repair the deteriorating conditions over the decades. Although another branch of the Cache Creek Ditch has enjoyed occasional use in the intervening years since the 1920s, this use was sporadic and made by persons without clear claim of right to the water.

At the conclusion of Southeastern's case in chief the water judge ruled that from June 24, 1912, to the present there has been nonuse of the subject water rights as decreed on March 18, 1912. Because nonuse had been demonstrated for an unreasonable period of time, the judge ruled that a prima facie case of abandonment had been established, and that the burden of rebutting this presumption shifted to Twin Lakes Associates and O'Neill.

In an effort to rebut the presumption of abandonment, O'Neill described efforts to restore and maintain certain of the ditches and the uses to which the water rights in question had been put at various times. He testified that he had made several mining leases on the property on a royalty basis, but acknowledged that, since he had received no royalties, he changed to a straight lease payment system in 1980.

Two geological engineers testified concerning the economic suitability of the Cache Creek Park area for placer mining. They stated that gold mining has cyclical economic returns, that placer mining for gold generally was economically unfeasible in this region from about 1920 until the early 1970s, and that there has been only small-scale mining in the area since the cessation of large-scale hydraulic mining in the early part of this century. According to one of the engineers, these small-scale mining efforts would have required less water than that used by Twin Lakes Placers in its mining operations. Both witnesses were of the opinion that low grade gold deposits probably remain in the area and that mining the gold might be economically feasible. There was no evidence, however, that gold mining in the area had been carried out under a valid lease, although there was testimony that mining leases were sometimes made through word of mouth and a handshake rather than through written leases. There was evidence that, although the chain of title to the properties originally belonging to Twin Lakes Placers contained numerous leases and conveyances, there was no conveyance by Twin Lakes Placers of its interest in the properties or water rights.

At the conclusion of the evidence, the water judge made extensive findings of fact, including the following:

—that from 1909 to 1912 Twin Lakes Placers defended a case in the District Court of Fremont County that resulted in a permanent injunction on June 24, 1912, enjoining the company from any activity by which placer mining tailings or debris might be discharged into the Arkansas River;

—that in this action Twin Lakes Placers acknowledged an injunctive decree

would wholly destroy the value of their properties, including the water rights, ditches, flumes, and canals;

—that Twin Lakes Placers and its successors have never challenged, appealed, or sought modification of the injunction, notwithstanding the fact that the injunction decree expressly authorized the parties and their successors to apply to the court for a modification of the injunction;

—that subsequent to the 1912 injunction, Twin Lakes Placers and its successors permitted the hydraulic mining equipment and the structures of the Cache Creek, Arlington, and Clear Creek Ditches to deteriorate to the point of being totally unusable;

—that subsequent to the permanent injunction of June 24, 1912, Twin Lakes Placers intended to permanently discontinue, and did permanently discontinue, the use of all water available under the decree of March 18, 1912, for the Cache Creek, Arlington, and Clear Creek Ditches;

—that Twin Lakes Placers' license to do business in Colorado was suspended by the Secretary of State on September 27, 1915;

—that Twin Lakes Placers, faced with the necessity of great expense in disposing of glacial flour in its hydraulic mining operation as a result of the 1912 injunction, and having already nearly exhausted the gold in the Cache Creek basin, "quietly walked away" from its mining operations with the intent to abandon its equipment, its placer mines, and its water rights;

—that Chaffee and Lake Counties listed properties of Twin Lakes Placers for tax sale in 1912, except Cache Creek No. 133 Placer, which was listed for tax sale in 1915;

—that Twin Lakes Placers never redeemed any of these properties, even though they could have been redeemed for less than $2500;

—that except for Cache Creek No. 133 Placer, the Chaffee County properties owned by Twin Lakes Placers were con-

veyed to H.K. Frey by treasurer's deed on February 28, 1916;

—that the deed did not describe any of the subject water rights but did list the properties together with "seven miles of Cache Creek and Clear Creek Ditches" and that seven miles is the approximate length of those segments of the Cache Creek and Clear Creek Ditches located within the boundaries of Chaffee County;

—that H.K. Frey conveyed a one-half interest in the Chaffee County properties, together with the seven miles of Cache Creek and Clear Creek Ditches, to Horatio Preston on February 28, 1916;

—that on July 22, 1916, Frey and Preston obtained a quiet title decree with respect to these properties for the purpose of placer mining, together with the Cache Creek and Clear Creek Ditches and all water and water rights appurtenant to the properties for the purpose of placer mining, and that Twin Lakes Placers never entered an appearance or filed an answer to the quiet title action;

—that the north branch of the Cache Creek Ditch was not used to divert water to the decreed place of use from June 24, 1912, to the present and that, notwithstanding the fact that O'Neill had conducted some maintenance on portions of the ditch since 1972, the entire length of the ditch was not maintained from June 24, 1912, to the present date;

—that the Arlington Ditch was not used to divert water to the decreed place of use from June 24, 1912, to the present date, and that such ditch has not been usable for more than seventy years due to the rapid destruction of the wooden flumes and the erosion and filling of other portions of the ditch;

—that Clear Creek Ditch was not used to divert water for beneficial use and was not maintained over its entire length from June 24, 1912, until the present date;

—that the extremely deteriorated condition of the ditches was such that any sporadic small-scale mining fell far short of a showing of continued use of the subject water rights after the 1912 injunction;

—that no abstract of a complete chain of title was offered with respect to the water rights in issue and that the documents offered into evidence did not establish a use of the water rights by anyone under any claim of right or with the permission of an owner;

—that Twin Lakes Associates and O'Neill failed to demonstrate any reasonable or acceptable justification for the long nonuse of the subject water rights;

—that all of the water rights in issue were abandoned by Twin Lakes Placers following the entry of the 1912 injunction; and

—that, alternatively, the long period of nonuse following the injunction, coupled with the absence of justification for such nonuse, created a presumption of abandonment which was not rebutted by Twin Lakes Associates and O'Neill.

Based on its findings, the water court granted Southeastern's application for a determination of abandonment, cancelled all six water rights awarded in the 1912 decree, and permanently enjoined any diversions based on the cancelled water rights. The court also dismissed Twin Lakes Associates' and O'Neill's application for a determination with respect to a change of water right.

Twin Lakes Associates and O'Neill seek reversal of the judgment for three reasons. They initially claim that, since Chaffee and Lake Counties held tax liens on the property and water rights in 1912, and because Twin Lakes Placers continuously used the water rights for several years after 1912, Twin Lakes Placers could not have abandoned its water rights in 1912. They next argue that the water court erred in finding that all six water rights were unused subsequent to the entry of the injunctive decree on June 24, 1912. Finally, they contend that the water court erred in failing to consider evidence of O'Neill's intent to use the water, which evidence was offered to rebut the presumption of abandonment created by nonuse of the rights for an unreasonable time. Since the resolution of these claims depends basically on whether the water court applied the correct legal stan-

dards in resolving the issue of abandonment, we believe it appropriate to begin by reviewing those long-standing principles applicable to the abandonment of a water right.

## II.

■ Abandonment occurs when the owner of a water right, at any time following its acquisition, intends to give up the right and permanently relinquishes or discontinues its use. *Knapp v. Colorado River Water Conservation District*, 131 Colo. 42, 53, 279 P.2d 420, 425–26 (1955); *see also* § 37-92-103(2), 15 C.R.S. (1988 Supp.) (abandonment of a water right defined as "the termination of a water right in whole or in part as a result of the intent of the owner thereof to discontinue permanently the use of all or part of the water available thereunder"). Abandonment requires a concurrence of nonuse and intent to abandon. *Beaver Park Water, Inc. v. City of Victor*, 649 P.2d 300, 302 (Colo.1982); *Farmers Reservoir and Irrigation Co. v. Fulton Irrigating Ditch Co.*, 108 Colo. 482, 487, 120 P.2d 196, 199 (1941). Because intent can rarely be proven by direct evidence, abandonment may be inferred from all the circumstances of the case. *Knapp*, 131 Colo. at 53–54, 279 P.2d at 426.

■ Although nonuse alone cannot establish intent to abandon, continued and unexplained nonuse for an unreasonable time can give rise to a rebuttable presumption of abandonment. *Beaver Park*, 649 P.2d at 302; *see also Knapp*, 131 Colo. at 53–54, 279 P.2d at 426; *Farmers*, 108 Colo. at 487, 120 P.2d at 199. The effect of this presumption is to shift "the burden of going forward to the water rights' owner who may then introduce evidence sufficient to rebut the presumption established by nonuse." *Beaver Park*, 649 P.2d at 302.

Nonuse can be manifested by conditions inconsistent with active use of a water right. Such conditions include failure to make beneficial use of water, failure to repair or maintain diversion structures, vacation of the land on which the water right had been used, failure to defend legal challenges to the water rights, and failure to

pay taxes on the land. *Knapp,* 131 Colo. at 49–52, 279 P.2d at 424–25. Nonuse can also be shown by the sporadic use over a long period of a substantially smaller quantity of water than that originally decreed, since such diminished and sporadic use over a period of years may "justify the conclusion that there was no real intention to continue the conditions of diversion and application to a beneficial use that were established, or that we assume were established, when the decree awarding the priority was entered." *Farmers,* 108 Colo. at 493, 120 P.2d at 202. The amount of time considered to be "unreasonable" will necessarily vary with the facts of the case. *See, e.g., Beaver Park,* 649 P.2d at 301 (twenty years of nonuse established prima facie case of abandonment); *CF & I Steel Corp. v. Purgatoire River Water Conservancy District,* 183 Colo. 135, 139, 515 P.2d 456, 458 (1973) (fifty-four years of nonuse was unreasonable); *Farmers,* 108 Colo. 482, 120 P.2d 196 (forty years of nonuse gave rise to inference of abandonment); *see also* § 37–92–402(11), 15 C.R.S. (1988 Supp.) (state engineer may presume abandonment for purposes of constructing abandonment list on basis of failure for ten years or more to apply to beneficial use the water available under water right when needed by person entitled to use the water). Where a water right has passed over a long period of time through a chain of paper title, inquiry on the issue of abandonment "may not be limited to the duration of ownership or occupancy of any one company, individual, or group of individuals," but extends to the action or inaction of successive owners with respect to the water right in question. *Knapp,* 131 Colo. at 48, 279 P.2d at 423.

 A presumption of abandonment may be rebutted by evidence of justifiable excuse for the nonuse, *Knapp,* 131 Colo. at 54–55, 279 P.2d at 426, but acceptable justifications for an unreasonable period of nonuse are extremely limited. *Beaver Park,* 649 P.2d at 302 n. 1. Evidence sufficient to rebut the presumption of abandonment must consist of more than mere subjective declarations by the owner of the water right that he did not intend to abandon the right, or that he intended to resume use of the right at some future time. *See Beaver Park,* 649 P.2d at 302; *Knapp,* 131 Colo. at 55, 279 P.2d at 426–27. To rebut the presumption of abandonment arising from nonuse, there must be evidence of facts or conditions that excuse the long period of nonuse. *Knapp,* 131 Colo. at 55, 279 P.2d at 426; *see also Mason v. Hills Land & Cattle Co.,* 119 Colo. 404, 408–09, 204 P.2d 153, 155–56 (1949); 2 C. Kinney, *Irrigation and Water Rights* § 1104, at 1988 (2d ed. 1912). Nonuse resulting from present economic difficulties, coupled with an expectation of a more favorable economic climate for future use, will not constitute justifiable excuse. *C F & I Steel,* 183 Colo. at 140, 515 P.2d at 458. Nor will an expressed desire to place the land and related water right on the market for sale establish justifiable excuse, since "[s]peculation on the market, or sale expectancy, is wholly foreign to the principle of keeping life in a proprietary right and is no excuse for failure to perform that which the law requires." *Knapp,* 131 Colo. at 55–56, 279 P.2d at 427.

 Upon abandonment of a water right, the water originally decreed belongs to the stream and is subject to appropriation by others. *Rocky Mountain Power Co. v. White River Electric Ass'n,* 151 Colo. 45, 51, 376 P.2d 158, 161 (1962); *see also Gardner v. State,* 200 Colo. 221, 226, 614 P.2d 357, 360 (1980). If the former owner of an abandoned water right initiates a new appropriation, the priority of the new water right will be based on the date of the new appropriation. Any attempt by the former owner to claim a priority relating back to the priority date of the former right is of no avail. *Farmers,* 108 Colo. at 486, 120 P.2d at 199.

Since the issue of abandonment will generally depend on the particular circumstances of the case and often will involve conflicting evidence relating to nonuse and intent, it devolves upon the water court to resolve this issue by weighing all the evidence and assessing the credibility of the various witnesses. *See Masters Investment Co. v. Irrigationists Ass'n,* 702 P.2d

268, 272 (Colo.1985); *Knapp,* 131 Colo. at 55, 279 P.2d at 426; *Farmers,* 108 Colo. at 495, 120 P.2d at 203. The water court's resolution of a factual issue will not be overturned on appeal unless the evidence is wholly insufficient to support the decision. *Beaver Park,* 649 P.2d at 302; *see also Masters,* 702 P.2d at 272; *Knapp,* 131 Colo. at 55, 279 P.2d at 426.

It is within the framework of these principles pertaining to abandonment that we must evaluate the claims of Twin Lakes Associates and O'Neill, which center on the water court's consideration of particular aspects of the evidence in resolving the abandonment issue. We will consider each claim separately.

### III.

Twin Lakes Associates and O'Neill raise the following two-pronged argument in support of their claim that the water court erred in determining that Twin Lakes Placers abandoned its water rights in 1912: (1) since Chaffee and Lake Counties held tax liens on the mining properties and the water rights used on the properties, the water rights of Twin Lakes Placers could not have been abandoned without the acquiescence of the counties; and (2) the water rights were continuously used for several years after the entry of the 1912 injunction. We find these arguments devoid of merit.

### A.

The first prong of the argument is based on two unsupported assumptions. Twin Lakes Associates and O'Neill initially assume that the water court's determination of abandonment was based on a specific finding of abandonment during calendar year 1912. Although the water court found that Twin Lakes Placers in 1912, confronted with the necessity of great expense in the face of the 1912 injunction and having nearly exhausted the gold in the Cache Creek basin, "quietly walked away" from its mining operations with intent to abandon its equipment, land, and water rights, the court did not expressly find that the abandonment itself occurred in calendar year 1912. Rather, the water court determined that "all of the subject water rights were abandoned by Twin Lakes Placers, Ltd., *following the entry of the 1912 injunction*" (emphasis added). This determination is broad enough to place the actual abandonment in a time frame following, not necessarily within, calendar year 1912. Separate and apart from this determination, the water court alternatively found that the long period of nonuse following the 1912 injunction, coupled with the absence of justification for nonuse, "created a presumption of abandonment which, by virtue of the extensive passage of time in which the subject water right[s] accrued to others for beneficial use, has not been rebutted or overcome."

■ The second assumption underlying Twin Lakes Associates' and O'Neill's argument is that the counties' tax liens necessarily attached not only to the real properties of Twin Lakes Placers but also to its water rights. This assumption, however, is incorrect.

> [A] water right is a property right separate and apart from the land on which it is used. . . . The land for which it was appropriated or on which it has been used may be conveyed or held without the water, and the water may be conveyed or held without the land . . . or any part of the land may be conveyed together with any part of the water right and the remainder be retained.

*Nielson v. Newmyer,* 123 Colo. 189, 192–93, 228 P.2d 456, 458 (1951) (citations omitted). When, as here, a county has levied upon and sold land for delinquent taxes, the conveyance is considered involuntary, and unless there is an express reference in the treasurer's deed to water rights or a clear indication in the circumstances attending the conveyance that the transfer of water rights is intended, it is presumed that the water rights did not pass with the land. *See Cooper v. Shannon,* 36 Colo. 98, 103–04, 85 P. 175, 177 (1906); *see generally Bessemer Irrigation Ditch Co. v. Woolley,* 32 Colo. 437, 76 P. 1053 (1904); *Arnett v. Linhart,* 21 Colo. 188, 40 P. 355 (1895).

In this case, a 1916 treasurer's deed conveyed all the placer parcels located in Chaffee County, except Placer No. 133, to H.K. Frey. This 1916 deed included seven miles of the Cache Creek and Clear Creek Ditches in the conveyance but did not expressly include water rights. A 1919 treasurer's deed conveyed Placer No. 133 to H.K. Frey and Horatio Preston and failed to include water rights in the conveyance. Since, as the water court found, Twin Lakes Placers "quietly walked away" from its mining operations with the intent to abandon its equipment, mines, and water rights following the entry of the injunctive decree of June 24, 1912, it might well have been that Chaffee County considered the water rights as already abandoned. At any rate, even if the circumstances of the tax sales are viewed as supportive of an inference that Chaffee County intended to convey the water rights with the placer parcels described in the treasurer's deed, the evidence of long and continued nonuse for several decades following the tax sale by the purchasers of the treasurer's deeds and those claiming under them provides a firm evidentiary basis for the water court's finding of abandonment. *See Knapp,* 131 Colo. at 47–48, 279 P.2d at 423.

With respect to the three placer parcels located in Lake County, a 1919 treasurer's deed on one of the parcels contained no reference to water rights, but treasurer's deeds issued in 1929 and 1935 for the other two parcels did include the water rights in the conveyances. However, even though Lake County intended to convey the water rights in connection with the sale of at least two of the placer mining parcels, there was sufficient evidence in the record from which the water court could reasonably infer that the purchasers of the treasurer's deeds and their successors in interest did not put the water rights to beneficial use in accordance with the original decree. This evidence of subsequent nonuse can only be viewed as confirmation of the fact that all the water rights originally decreed for placer mining uses in connection with Twin Lakes Placers' Lake County operations, even if not permanently relinquished in 1912 by Twin Lakes Plac-ers, were certainly abandoned during the ensuing decades of nonuse. *Id.*

### B.

The second prong of Twin Lakes Associates' and O'Neill's initial claim is that the record is barren of any evidence to support the water court's finding that upon entry of the 1912 injunction Twin Lakes Placers discontinued using the water rights with the intent to abandon them. We take a different view of the record.

Abandonment of a water right requires a concurrence of nonuse and an intent to abandon, and an unreasonably long period of nonuse is itself circumstantial evidence of an intent to abandon. *E.g., Masters Investment Company,* 702 P.2d at 272; *Beaver Park,* 649 P.2d at 300; *Farmers,* 108 Colo. at 487, 120 P.2d at 199. In its answer to the 1912 injunction action, Twin Lakes Placers conceded that the injunction would render its land and water rights worthless. That this was not an exaggerated claim was evidenced by the cessation of Twin Lakes Placers' mining activities following the injunctive decree. Not only did Twin Lakes Placers fail to request any modification of the decree, as it had the right to do, it made no effort to redeem its lands from the tax sales conducted in 1912 and 1915. After the suspension of its license to do business in Colorado in 1915, Twin Lakes Placers never again exercised the water rights in question. We thus conclude that the evidence clearly supports the water court's determination that Twin Lakes Placers, upon the entry of the injunction in 1912, discontinued using its water rights with the intent to abandon them.

### IV.

Twin Lakes Associates and O'Neill next raise two arguments in support of their claim that the water court erred in finding that all six water rights had been abandoned after June 24, 1912: (1) the court erroneously disregarded various aspects of the evidence relating to the use of the water on the land subsequent to 1912, with the result that the court incorrectly

applied the presumption of abandonment to this case and erroneously shifted the burden to Twin Lakes Associates and O'Neill to present evidence in rebuttal of the presumption; and (2) the court incorrectly considered as evidence of abandonment the absence of any mention of water rights in some of the conveyances subsequent to 1912. We are unpersuaded by both arguments.

## A.

Twin Lakes Associates and O'Neill stress that there was evidence of continuous small-scale mining in the Cache Creek Park area and that this evidence was ignored by the water court. Although there was some evidence of sporadic use of the water over the years subsequent to 1912, it was by no means continuous and, as expressly determined by the water court, was not supported by evidence showing that such use was "under any claim of right to the subject water rights or with the permission of any owner through whom [Twin Lakes Associates and O'Neill] claim." Moreover, there was evidence showing that the ditches and diversion structures, for the most part, were incapable of carrying water from the early 1920s and that, even with a few minor repairs made during the 1940s and in later years, they were never restored to a usable state. Finally, the water judge during the trial viewed portions of the Arlington, Cache Creek, and Clear Creek Ditches and found that the Arlington and Clear Creek Ditches were "greatly dilapidated and in a state of utter disrepair" and that the wooden flume structures on the prominent portions of the Arlington and Clear Creek Ditches "were deteriorated to such an extent that they could not possibly convey water." Far from disregarding the evidentiary offerings of Twin Lakes Associates and O'Neill on use of the water subsequent to 1912, the water court expressly acknowledged such evidence, but found the use of the water to be sporadic and, for the most part, by persons neither owning the subject water rights nor authorized by the owners to use the water rights.[4]

Twin Lakes Associates and O'Neill also stress the water court's failure to make a specific finding of nonuse for an unreasonable period of time with respect to the Lost Canyon branch of the Cache Creek Ditch. Although the water judge did not make a detailed finding of nonuse with respect to this water right, the court did find at the conclusion of Southeastern's case that from June 24, 1912, to the present there had been nonuse of the "subject water rights" decreed on March 18, 1912, and that this period of nonuse established a prima facie case of abandonment. Clearly, the water right originally decreed to the Lost Canyon branch of the Cache Creek Ditch was part of the "subject water rights" involved in the instant litigation.[5] Moreover, at the conclusion of all the evidence the water court made two findings which clearly show that the Lost Canyon water right was within the intendment and scope of the water court's ruling on abandonment. One of those findings was basically that water had not been diverted "from 'Lost [Canyon]' or Cache Creek from June 24, 1912

---

**4.** Twin Lakes Associates and O'Neill also emphasize that part of their case which showed that as a teenager O'Neill and his grandfather exercised the water rights in question in the early 1940s, using different points of diversion from those decreed in 1912. Such sporadic use, while obviously relevant to the issue of intent, was insufficient in the water court's view to rebut the presumption of abandonment. Twin Lakes Associates and O'Neill also point to testimony concerning O'Neill's recent improvements to the ditches and use of water. The water court, however, had sufficient evidence to decide that the water rights had been abandoned long before O'Neill began to make improvements along the ditches.

**5.** One of Southeastern's witnesses was Edward Butkovich, who testified that from 1960 to the present he spent many summer weekends mining on lands belonging to the Bureau of Land Management. He used undecreed water on these ventures, and he never saw the owner of much of the Lost Canyon land use water on that land. This witness also described some sporadic small-scale mining on the Lost Canyon branch of the Cache Creek Ditch, but when asked if he knew anyone who had used the ditch in the last twenty-five years he could only name himself and two others.

until at least 1984 by any owner of the subject water rights, or by any person authorized by any owner thereof to use the subject rights." The other finding was that the long period of nonuse of the "subject water rights," coupled with the absence of any justification for such nonuse, created the presumption of abandonment which had not been satisfactorily rebutted or overcome.

In light of the evidentiary state of the record, we cannot conclude, as argued by Twin Lakes Associates and O'Neill, that the water court erroneously disregarded the evidence relating to the use of the water subsequent to 1912. Nor does the record, considered in its totality, support the claim that the water court's ruling was predicated on an incorrect application of the presumption of abandonment or an erroneous shifting to Twin Lakes Associates and O'Neill of the burden of going forward with evidence to rebut or overcome the presumption of abandonment.

### B.

We need not labor long over the argument that the water court erred in considering the absence of any mention of water rights in some conveyances subsequent to 1912 as evidence of abandonment. The water court simply found that the documentary evidence relating to the chain of title was inadequate to overcome the presumption of abandonment. This conclusion is obvious from the following findings of the water court:

> [Twin Lakes Associates and O'Neill] offered hundreds of pages of documentary evidence dating from the Nineteenth Century to the present. Despite the plethora of documents, no abstract of a complete chain of title was offered, and what was offered contained significant omissions of the description of these water rights in the conveyances. The court also allowed extensive opportunities to [Twin Lakes Associates and O'Neill] to demonstrate that the activities of Dr. O'Neill, beginning in the late 1960s, somehow would demonstrate circumstantially the intention of the prior claimants

to the subject water rights. The Court finds that Dr. O'Neill's activities constitute only an attempt to revive what was already dead.

> The documents admitted into evidence do not establish a use of the subject water rights as decreed March 18, 1912. Some miners, including trespassers, may have used water from Lost Canyon and the natural drainage of Cache Creek for small scale mining purposes, but there is no satisfactory evidence that that use was under any claim of right to the subject water rights or with the permission of any owner through whom [Twin Lakes Associates and O'Neill] claim, and such use was only sporadic, for very limited periods.

> . . . .

> The extremely deteriorated condition (often to the point of non-existence) of the ditches in 1965, and as viewed by the Court on October 16, 1986, is so overwhelming that the demonstration of paper activity and sporadic small scale mining fall[s] far short of showing a continued use of the subject water rights after the 1912 injunction.

### V.

The final argument of Twin Lakes Associates and O'Neill is that the water court erred in failing to consider evidence of O'Neill's intent to use the water, which evidence was offered to rebut the presumption of abandonment created by the long period of nonuse of the water rights. We again find no merit in this argument.

A presumption of abandonment may be rebutted by evidence demonstrating a justifiable excuse for the long period of nonuse. *E.g., Beaver Park,* 649 P.2d at 302; *Knapp,* 131 Colo. at 54, 279 P.2d at 426; *Farmers,* 108 Colo. at 487, 120 P.2d at 199. While evidence of O'Neill's intent was relevant to the issue of abandonment, once the presumption of abandonment had been established it was not incumbent on the water court to make specific findings concerning the particular weight, if any, which it attributed to the evidence offered by O'Neill on the issue of intent. Further-

more, in its final ruling the trial court expressly noted that it had allowed Twin Lakes Associates and O'Neill extensive opportunities to demonstrate that "the activities of Dr. O'Neill, beginning in the late 1960s, somehow would demonstrate circumstantially the intention of the prior claimants to the subject water rights." Notwithstanding these opportunities, the water court expressly found that "Dr. O'Neill's activities constitute only an attempt to revive what was already dead."

It was the prerogative of the water court in the exercise of its fact-finding function to weigh the evidence before it, as it did, and to ultimately resolve whether that evidence was sufficient to overcome the presumption of abandonment resulting from the unreasonable period of nonuse. There is no basis in the evidentiary state of the record for this court to overturn the water court's resolution of the abandonment issue under the circumstances of this case.

The judgment is accordingly affirmed.