**SOUTHEASTERN COLORADO WATER CONSERVANCY DISTRICT, Complainant–Appellee,**

**and**

Cache Creek Mining Trust, Board of Water Works of Pueblo, Colorado, Twin Lakes Reservoir and Canal Company, City of Colorado Springs, City of Aurora, United States of America, State Engineer, Jeris A. Danielson, and the Division Engineer for Water Division No. 2 and Parkville Water District, Respondents–Appellees,

**v.**

**Dennis O'NEILL, Respondent–Appellant.**

**No. 90SA332.**

Supreme Court of Colorado,
En Banc.

Sept. 16, 1991.
Rehearing Denied Oct. 21, 1991.

Fairfield and Woods, P.C., Howard Holme, Stephen H. Leonhardt, Denver, for complainant-appellee.

Peterson & Fonda, William F. Mattoon, Pueblo, for Bd. of Water Works of Pueblo.

Carlson, Hammond & Paddock, John U. Carlson, Tod J. Smith, Lee H. Johnson, Denver, for Twin Lakes Reservoir and Canal Co., and Sp. Counsel to Bd. of Water Works of Pueblo.

Anderson, Johnson & Gianunzio, Gregory L. Johnson, Colorado Springs, for City of Colorado Springs.

Petrock, Fendel & Dingess, P.C. John M. Dingess, Denver, for City of Aurora.

Michael J. Norton, U.S. Atty., John R. Hill, Jr., U.S. Dept. of Justice, Environment and Natural Resources Div., Denver, for U.S.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Patrick E. Kowaleski, Asst. Atty. Gen., Denver, for State Engineer and Div. Engineer for Water Div. No. 2.

Cosgriff, Dunn & Berry, P.C., Peter Cosgriff, Leadville, for Parkville Water Dist.

Dennis O'Neill, pro se.

John W. Dunn, County Atty., for amicus curiae Bd. of County Com'rs of Lake County.

Justice QUINN delivered the Opinion of the Court.

This case is a sequel to our decision in *Southeastern Colorado Water Conservancy District v. Twin Lakes Associates, Inc.,* 770 P.2d 1231 (Colo.1989). In that decision we affirmed a judgment of the water court which determined that six water rights decreed in 1912 to three ditches had been abandoned, and which canceled the water rights and permanently enjoined any future diversions from the three ditches based on the canceled water rights. Following our decision, Dennis O'Neill, the President and Chair of the Board of Directors and principal owner of Twin Lakes Associates, Inc. (hereinafter collectively referred to as O'Neill), filed a C.R.C.P. 60(b)(5) motion in the water court seeking relief from that part of the judgment which determined the water rights on the Cache Creek Ditch, one of the three ditches involved in the prior litigation, to have been abandoned.[1] O'Neill's motion alleged that newly discovered evidence demonstrated the continued use of the Cache Creek Ditch water rights and that, therefore, evidence of nonuse on which the water court relied in the prior litigation was insufficient to support the prior determination of abandonment. The water court denied the motion and O'Neill has appealed to this court.[2] We affirm the judgment.

---

1. The Rule 60(b)(5) motion was filed by O'Neill and Twin Lakes Associates, and both parties filed a notice of appeal. Twin Lakes Associates, however, has since withdrawn its notice of appeal.

2. This court has appellate jurisdiction over appeals from a judgment in a proceeding concerning water rights. Section 13–4–102(1)(d), 6A C.R.S. (1987); C.A.R. 1(a)(2); *see e.g., Matter of Application for Water Rights,* 688 P.2d 1102, 1105 n. 5 (Colo.1984).

## I.

To place the issue before us in proper perspective, a review of the procedural history of this case relative to O'Neill's claim to water rights on the Cache Creek Ditch is necessary. O'Neill claimed ownership to six water rights, originally decreed in 1912 to the Clear Creek, Arlington, and Cache Creek Ditches, located in Lake and Chaffee Counties, for use in placer goldmining activity by O'Neill's predecessor in interest, Twin Lakes Placers, Ltd. (Twin Lakes Placers). On May 22, 1985, the Southeastern Colorado Water Conservancy District filed a complaint for a determination of abandonment with respect to O'Neill's six water rights. The water court conducted a seven-day trial on the abandonment issue in 1986 and 1987. The evidence admitted during the trial established that Cache Creek Ditch basically was a man-made ditch that diverted water from Cache Creek and Clear Creek, which are natural streams tributary to the Arkansas River. Cache Creek Ditch extended approximately eight to nine miles through portions of Chaffee and Lake Counties and conveyed water eastwardly along a route south of Twin Lakes and then into the Cache Creek Basin. On March 18, 1912, two water rights totalling forty cubic feet per second were decreed to the Cache Creek Ditch for use by Twin Lakes Placers in its placer gold-mining operations. Shortly thereafter, however, on June 24, 1912, the District Court of Fremont County enjoined Twin Lakes Placers from any mining activity that might result in discharging tailings or debris into the Arkansas River. Following the injunctive proceeding, Twin Lakes Placers ceased its gold-mining activities, and its mining properties were eventually conveyed to other owners by treasurer deeds. The ditches and flumes previously used in Twin Lakes Placers' mining activity fell into disrepair and became unusable.

During the years subsequent to the cessation of Twin Lakes Placers' mining activity, parts of Cache Creek Ditch were washed out and other parts were filled in by dirt and debris. Although some miners, including trespassers, used the natural drainage of Cache Creek for small scale mining purposes, there was no evidence offered in the abandonment trial demonstrating that such use was under any claim of right to the previously decreed water rights in the Cache Creek Ditch or that such use was with the permission of any owner of the water rights. O'Neill submitted much documentary evidence at the 1986–87 abandonment trial, but his evidence contained significant omissions with respect to the chain of title for the water rights at issue.

At the conclusion of the trial on the abandonment issue, the water court ruled as follows with respect to the Cache Creek Ditch water rights: that subsequent to the 1912 injunction Twin Lakes Placers intended to and did discontinue the use of all water available under the 1912 decree for the Cache Creek Ditch; that subsequent to 1912 some miners, including trespassers, may have sporadically used water from the natural drainage of Cache Creek for small scale mining but such use was not under any claim of right to the water rights or with the permission of any owner of the water rights; that the extremely deteriorated condition of the ditches, often to the point of non-existence, was so overwhelming that the demonstration of paper activity and sporadic small scale mining fell "short of showing a continued use of the subject water rights after the 1912 injunction"; and that O'Neill made a damaging admission against interest when in 1979 he told a placer-mine appraiser that any water rights conveyed with the placer mine, including the Cache Creek Ditch water rights, were of no value. The water court accordingly ruled that the water rights decreed in 1912 to the Cache Creek Ditch had been abandoned.[3] In affirming the decision of the water court, we acknowledged that there was some evidence of sporadic use of Cache Creek water since 1912 but that the use, as expressly found by the

---

**3.** Our previous opinion in *Southeastern Colorado Water Conservancy District v. Twin Lakes Associates, Inc.,* 770 P.2d 1231 (Colo.1989), contains a more complete recitation of the findings of the water court.

water court, "was by no means continuous and ... was not supported by evidence showing that such use was 'under any claim of right to the subject water rights or with the permission of any owner through whom [Twin Lakes Associates and O'Neill] claim.'" *Twin Lakes Associates*, 770 P.2d at 1241.

Approximately one year after our decision in *Twin Lakes Associates*, O'Neill filed a C.R.C.P. 60(b)(5) motion in which he alleged that newly discovered evidence entitled him to relief from that part of the judgment pertaining to the abandonment of the water rights decreed to the Cache Creek Ditch in 1912. O'Neill supported his motion by various articles describing the history of gold mining in the area and numerous deeds and other documents, many of which were admitted at the prior trial, four affidavits of potential witnesses, and a lengthy legal memorandum. Several of O'Neill's evidentiary offers consisted of excerpts from the annual publication of the United States Geological Survey, *Mineral Resources of the United States* (Mineral Resources Yearbook), for various years between 1912 and 1948. The following excerpts are representative of O'Neill's evidentiary offer:

*Granite district.*—The Twin Lakes Placer Co., with ancient river bed placer ground on Cache Creek, prior to 1911 an important producer of placer gold by hydraulicking, having been enjoined in 1911 from polluting the water of Arkansas River, has confined its operations to shoveling gravel into sluice boxes. (1913 Mineral Resources Yearbook).

*Granite district.*—The ancient river bed placer ground on Cache Creek ... was sluiced, in a small way by various operators. A small shipment of lead ore, carrying gold and silver, was made from the Margaret mine. (1914 Mineral Resources Yearbook).

*Four Mile district.*—A small quantity of placer gold was recovered from sluicing operations in the Granite district. The placer ground on Cache Creek was an important producer of placer gold by hydraulicking prior to 1911, but the opera-

tions were stopped in that year because of the pollution of the water of Arkansas River, which affected the water supply of the towns of Canon City and Pueblo. Small lots of ore were shipped from the Margaret and Yankee Blade mines. (1915 Mineral Resources Yearbook).

*Granite district.*—A small quantity of placer gold was sluiced from gravels along Arkansas River. (1917 Mineral Resources Yearbook).

*Granite district.*—A small sluicing operation on the bench gravels of the Arkansas River, near Granite, recovered 5.81 ounces of gold. During the summer and fall of 1927 a suction dredge boat was in course of construction on the west side of the Arkansas River, below Granite. The plan is to float the boat in the river and to draw up the fine river gravel and silt, which will be treated on the boat. The site is just below the bench gravels on Cache Creek, from which $1,500,000 to $3,500,000 in placer gold was recovered by sluicing and hydraulicking from 1859 to 1911, when the work was stopped by court injunction at the request of the cities of Pueblo, Canon City, and Salida. (1927 Mineral Resources Yearbook).

*Granite district.*—... Individuals recovered small lots of placer dust by sluicing along Arkansas River and Cache Creek. (1939 Mineral Resources Yearbook).

*Granite district (see also Lake County).*—... The Raeanna Mining Co. worked placer ground on Cache Creek with a dragline, caterpillar bulldozer, and washing plant from May 15 to July 3. In November the company gave up its lease on the property.... The Deep Lead, Independent, Franklin, Georgia Bar, and other placers on the Arkansas River near Granite were worked on a small scale with sluices, and drift mining was done at the Channel and North Star placers. (1940 Mineral Resources Yearbook).

*Granite District.*—... The Good Hope Mining Co., Ltd., worked the Good Hope placer on Cache Creek from June 11 to October 19, using a power shovel, bulldozer, and sluices. (1947 Mineral Resources Yearbook).

In addition, O'Neill offered the following documents in support of his motion: a 1926 letter from a mining engineer to the owner of a mine known as Cache Creek Placer on Cache Creek in Granite, Colorado, in which the engineer evaluated the mine's potential;[4] minutes from two meetings in 1938 and 1939 of the Lake County Board of County Commissioners, in which brief mention was made of the cleanup of the "Oregon Placer," which had been located on the Cache Creek Ditch; a 1939 and a 1940 Colorado Bureau of Mines Inspector's Report briefly describing the placer mines of Raeanna Mining Company and Cache Creek Placer on Cache Creek;[5] and an excerpt from a 1940 letter to the Bureau of Mines in which the manager of Raeanna Mining Company stated that "we were . . . getting our water troubles fixed up."

O'Neill also offered the affidavits of four witnesses. The affidavit of John W. Patterson, the former Division Engineer for Water Division No. 2, stated that he observed water being diverted through the Cache Creek Ditch on one occasion, probably in 1964, and again on July 24, 1980. The affidavit of George Wright, the vice president of Wright Engineering, stated that the company engaged in development work on mining properties on Cache Creek Ditch from 1984 to 1986, and that other placer miners had been working the ditch prior to 1984. The affidavit of Stephen M. Voynick stated that he authored a short paper in 1989 entitled "Cache Creek Park, The Survival of One of Colorado's Oldest Gold Mining Districts," in which he described some mining activities on Cache Creek Ditch following the cessation of mining operations by Twin Lakes Placers in 1912. The affidavit of James L. Treat stated that he was qualified to give an opinion as to the nature of and quality of the conveyances relating to the Cache Creek

Placers and the Cache Creek Ditch water rights but gave no such opinion in the affidavit itself.

Twin Lakes Reservoir and Canal Company filed a response to O'Neill's motion and contended that it was untimely and failed to satisfy the strict requirements for relief based on newly discovered evidence. Southeastern Colorado Water Conservancy District, the United States of America, the City of Aurora, and other parties responded in similar fashion to O'Neill's motion.

The water court considered O'Neill's submissions and denied the motion. In the court's view, O'Neill's new evidence could have been discovered prior to trial by using reasonable diligence, or, alternatively, would not have been admissible at trial, or, in any event, would not have changed the result of the trial. O'Neill then filed this appeal, contending that the water court legally erred in denying his Rule 60(b)(5) motion.[6] Before addressing the merits of O'Neill's claim, we first consider the proper standard for resolving a Rule 60(b)(5) motion predicated on newly discovered evidence.

## II.

C.R.C.P. 60(b) provides, in relevant part, as follows:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) Mistake, inadvertence, surprise, or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or other-

**4.** Although the 1926 letter referred to the Cache Creek Placer Mine on Cache Creek, we assume the mine was located on Cache Creek Ditch.

**5.** As in the case of the 1926 letter, we assume that the Raeanna Mine and the Cache Creek Placer Mine were actually located on Cache Creek Ditch, as distinguished from Cache Creek.

**6.** The Lake County Board of County Commissioners, which had intervened in the proceeding below for the avowed purpose of protecting its interest in taxing private water rights within the county and of promoting the development of water and mining resources in Lake County, filed a brief in this court challenging the water court's denial of the Rule 60(b)(5) motion.

wise vacated, or it is no longer equitable that the judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment.

The first four subsections of this rule list specific grounds for relief, while subsection (5) is basically a residuary clause directed to circumstances not encompassed within the preceding text. *Atlas Construction Co., Inc. v. District Court for Boulder County,* 197 Colo. 66, 69, 589 P.2d 953, 956 (1979). The purpose of Rule 60(b) is to strike a balance between the "preferred rule of finality of judgments" and the need to provide relief in the interests of justice in exceptional circumstances. *Cavanaugh v. State,* 644 P.2d 1, 5 (Colo.1982), *appeal dismissed,* 459 U.S. 1011, 103 S.Ct. 367, 74 L.Ed.2d 504 (1982), *rehearing denied,* 460 U.S. 1104, 103 S.Ct. 1806, 76 L.Ed.2d 369 (1983). We have insisted that in order "to avoid undercutting judgments unduly," the "other reason" clause of Rule 60(b)(5) should "be reserved for 'extraordinary circumstances' ... and 'extreme situations.' " *Canton Oil Corp. v. District Court,* 731 P.2d 687, 694 (Colo.1987) (citations omitted).

Although Rule 60(b) does not list newly discovered evidence as one of the grounds for relief, C.R.C.P. 59(d)(4) lists as one of the grounds for granting a new trial "[n]ewly discovered evidence, material for the party making the application which that party could not, with reasonable diligence, have discovered and produced at the trial." Rule 59(a) requires that a motion for a new trial predicated on newly discovered evidence must be filed "[w]ithin 15 days of entry of judgment as provided in C.R.C.P. 58 or such greater time as the court may allow," [7] while a Rule 60(b)(5) motion must be filed within a reasonable time after the entry of the judgment or order.

We have not previously determined whether the "any other reason justifying relief" language of Rule 60(b)(5) encompasses newly discovered evidence. Other jurisdictions, however, have considered this question and have held that the same criteria applicable to a motion seeking a new trial on the basis of newly discovered evidence also applies to a motion for relief from a judgment predicated on newly discovered evidence. *E.g., Matsumoto v. Asamura,* 5 Haw.App. 628, 706 P.2d 1311, 1313 (1985); *Vanalstyne v. Whalen,* 15 Mass. App. 340, 445 N.E.2d 1073, 1077 (1983) *aff'd,* 398 Mass. 1004, 495 N.E.2d 837 (1986); *see generally Peacock v. Board of School Commissioners,* 721 F.2d 210, 213–14 (7th Cir.1983); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2859 at 182 (1973).[8] In resolving a Rule 59(d)(4) motion for a new trial based on newly discovered evidence, we have utilized the following three-part test:

> first, the applicant must establish that the evidence could not have been discovered by the exercise of reasonable diligence and produced at the first trial; second, it must be shown that the evidence was material to an issue in the first trial; and third, the applicant must establish that the evidence, if admitted, would probably change the result of the first trial.

*Aspen Skiing Co. v. Peer,* 804 P.2d 166, 172 (Colo.1991); *see People v. Distel,* 759 P.2d 654, 660 (Colo.1988); *People in the Interest of P.N.,* 663 P.2d 253, 256 (Colo. 1983); *Kennedy v. Bailey,* 169 Colo. 43, 47, 453 P.2d 808, 810 (1969). This three-part test, in our view, strikes the appropriate balance between the preferential status accorded to final judgments and the need to provide judicial relief in exceptional circumstances in the interest of assuring a just result. We are satisfied, therefore, that, except for the differing time limit applicable to a Rule 59 motion, a motion for relief

7. C.R.C.P. 58(a) provides that, subject to the provisions of Rule 54(b), the court shall promptly prepare, date, and sign a written judgment, which the clerk shall then enter on the registry of actions, and that the effective date of the entry of judgment shall be the date set forth in the written judgment.

8. Unlike C.R.C.P. 60(b), which is silent on newly discovered evidence, the versions of Rule 60(b) in the above cited cases contained a "newly discovered evidence" provision in subsection (b)(2) of the rules under consideration.

from a judgment pursuant to Rule 60(b)(5) on the ground of newly discovered evidence should be resolved by the same criteria applicable to a Rule 59(d)(4) motion.

In applying the three-part test of Rule 59(d)(4), we have emphasized that these three factors "are not discrete items that lend themselves to a mechanistic application, but rather are closely interrelated and require the exercise of a prudential judgment informed primarily by considerations of fundamental fairness to the litigants." *Aspen Skiing Co.*, 804 P.2d at 172. For this reason, considerable discretion is reposed in the trial court in determining whether to grant a new trial on the ground of newly discovered evidence, and the court's ruling will not be disturbed in the absence of a clear showing of an abuse of discretion. *Id.; People in Interest of P.N.*, 663 P.2d at 256. "To say that a court has discretion in resolving a motion for a new trial based on newly discovered evidence simply means that it has the power to choose between two courses of action 'and is therefore not bound in all cases to select one over the other.' " *Aspen Skiing Co.*, 804 P.2d at 172 (quoting *People v. Milton*, 732 P.2d 1199, 1207 (Colo.1987)). That same broad discretion must be conceded to a trial court in resolving a Rule 60(b)(5) motion predicated on newly discovered evidence. *See Buckmiller v. Safeway Stores, Inc.*, 727 P.2d 1112, 1115 (Colo. 1986); *Columbine Valley Construction Co. v. Board of Directors, Roaring Fork School District RE–1J*, 626 P.2d 686, 696 (Colo.1981).

### III.

We turn then to O'Neill's claim. His argument proceeds as follows: that the proffered evidence of intermittent use of Cache Creek Ditch water for small scale mining activity from 1912 to the 1980s could not have been discovered by reasonable diligence before the 1986–87 trial on the abandonment issue; that such evidence was material to the issue of abandonment; and that such evidence probably would change the result by rebutting the presumption of abandonment arising from the

post–1912 evidence of non-use on which the water court relied in the prior litigation. The record leaves no doubt that the water court, in denying O'Neill's Rule 60(b)(5) motion, employed the proper three-part test applicable to newly discovered evidence. The only question is whether the court abused its discretion in its application of the three-part test to O'Neill's proffered evidence. We find no abuse of discretion in this case.

A party requesting relief from a judgment on the ground of newly discovered evidence initially must demonstrate that the evidence could not have been discovered by the exercise of reasonable diligence and thus could not have been produced at the first trial. This "reasonable diligence" requirement is based on the principle of finality whereby a party is "expected to gather all available evidence prior to trial and evaluate and submit such evidence as is consistent with the party's theory of litigation." *Aspen Skiing Co.*, 804 P.2d at 172. It was thus incumbent upon O'Neill to demonstrate that his newly discovered evidence "was not only unknown prior to the first trial but also could not have been timely discovered through reasonable efforts." *Id.* at 172–73. The record shows quite conclusively, however, that O'Neill had well over a year prior to the abandonment trial to gather the new evidence submitted in support of his Rule 60(b)(5) motion. Indeed, much of the proffered evidence was readily available to the general public, including the evidence from the annual Mineral Resources Yearbooks, the 1938 and 1939 minutes of the Lake County Board of County Commissioners, the 1939 and 1940 Bureau of Mines inspector's reports, and other documents and articles submitted in connection with O'Neill's Rule 60(b)(5) motion. O'Neill thus had adequate opportunity prior to the 1986–87 trial to determine whether this evidence would be relevant to the abandonment issue. In light of the preferential status accorded to final judgments and the limited applicability of Rule 60(b)(5) to extraordinary circumstances and extreme situations, as well as the broad discretion reposed in trial courts in granting or denying post-judgment relief

on the ground of newly discovered evidence, it would be inappropriate for us, under the circumstances of this case, to second guess the water court's determination that O'Neill's new evidence could have been discovered by reasonable diligence prior to the 1986–87 trial.

■ Although we could end our discussion here, we briefly address the other two elements of the three-part test for newly discovered evidence. To satisfy the materiality requirement, the evidence must be demonstrably germane to the substantive issues involved in the prior litigation and not merely cumulative or contradictory of other previously admitted evidence. *E.g., Trinidad Creamery Co. v. McDonald,* 82 Colo. 328, 331, 259 P. 1028, 1030 (1927); *Warshauer Sheep and Wool Co. v. Rio Grande State Bank,* 81 Colo. 463, 467, 256 P. 21, 22–23 (1927); *see Aspen Skiing Co.,* 804 P.2d at 173. We are satisfied that O'Neill's proffered evidence also fails to satisfy this requirement. The excerpts from annual Mineral Resource Yearbooks, for example, show that some mining activity sporadically occurred on the Cache Creek Ditch in the years subsequent to 1912 but do not establish any use of the disputed water rights under a claim of right. The 1926 letter from a mining engineer to an owner of Cache Creek Placer, in which the engineer evaluated the mine's potential, is likewise without significance. Furthermore, the minutes of the 1938 and 1939 meetings of the Lake County Board of County Commissioners merely refer to the "cleanup of the Oregon Placer" and make no mention of the disputed water rights. Although the 1939 mine inspection report includes a letter to the Bureau of Mines in which the manager of Raeanna Mining Company states that "we were ... getting our water troubles fixed up," the report does not link the statement to any of the Cache Creek Ditch water rights in dispute. In similar fashion, the affidavit by the former Division Engineer for Water Division

No. 2, which stated that he observed water being diverted through the Cache Creek Ditch in 1964 and 1980, fails to link up the diversions to the water rights at issue. In short, O'Neill's new evidence does not demonstrate that the occasional use of Cache Creek Ditch water subsequent to 1912 involved the disputed water rights decreed in 1912 to Cache Creek Ditch or that the intermittent diversions were made under a claim of right to those water rights.

■ Finally, O'Neill also failed to establish that his new evidence probably would change the result of the first trial. Although O'Neill's proffered evidence indicates that mining and associated water use took place on a sporadic basis since 1912, we observed in our prior opinion that the evidence of sporadic use of water for mining, unsupported as it was by any showing that such use was under a claim of right to the subject water rights or with permission of any of O'Neill's predecessors in interest, was insufficient to rebut the presumption of abandonment raised by continued and unexplained non-use for an unreasonable length of time. *Twin Lakes Associates, Inc.,* 770 P.2d at 1241–42. The same can be said of the new evidence offered by O'Neill in support of his Rule 60(b)(5) motion. Simply stated, the record before us falls far short of the clear showing of abuse of discretion necessary to overturn a trial court's resolution of a Rule 60(b)(5) motion predicated on newly discovered evidence.[9]

We accordingly affirm the judgment of the water court.

---

9. Twin Lakes Reservoir and Canal Company requests the imposition of sanctions against O'Neill on the ground that his appeal is frivolous. We cannot conclude that O'Neill's argument is totally devoid of "rational argument based on the evidence or law." *Mission Denver Co. v. Pierson,* 674 P.2d 363, 366 (Colo.1984). We accordingly decline to assess damages or costs as a sanction in this case.