The CITY AND COUNTY OF DENVER, acting By and Through its BOARD OF WATER COMMISSIONERS, Applicant–Appellant,

v.

SNAKE RIVER WATER DISTRICT; the Colorado River Water Conservation District; Middle Park Water Conservancy District; Breckenridge Ski Area; Northern Colorado Water Conservancy District; Dillon Valley District; Keystone–Arapahoe, Ltd.; Copper Mountain, Inc.; Town of Dillon; Town of Silverthorne; the Metropolitan Denver Water Authority; and the Division Engineer, Water Division No. 5, Objectors–Appellees.

No. 88SA365.

Supreme Court of Colorado,
En Banc.

March 12, 1990.

Rehearing Denied April 9, 1990.

---

Wayne D. Williams, Michael L. Walker and Casey S. Funk, Denver, for applicant-appellant.

Holme, Roberts & Owen, Glenn E. Porzak, Boulder, for objector-appellee Snake River Water Dist.

Donald H. Hamburg, Gen. Counsel, Colorado River Water Conservation Dist. Glenwood Springs, for objector-appellee Colorado River Water Conservation Dist.

Baker, Cazier and McGowan, Stanley W. Cazier, Granby, for objector-appellee Middle Park Water Conservancy Dist.

Delaney & Balcomb, P.C., Kenneth Balcomb, Glenwood Springs, for objectors-appellees Breckenridge Ski Area and Copper Mountain, Inc.

Sherman & Howard, Gary L. Greer, Denver, for objector-appellee Keystone–Arapahoe, Ltd.

Grant, Bernard, Lyons & Gaddis, Jeffrey J. Kahn, Longmont, for objector-appellee Town of Dillon.

Hill & Robbins, David Robbins, Denver, for objector-appellee Town of Silverthorne.

No appearance for Northern Colorado Water Conservancy Dist., Dillon Valley Dist., The Metropolitan Denver Water Authority and The Div. Engineer, Water Div. No. 5.

Justice LOHR delivered the Opinion of the Court.

The City and County of Denver, acting by and through its Board of Water Commissioners ("Board"), appeals the judgment of the District Court, Water Division No. 5 ("water court"), denying the Board's application for certain changes of water rights. The water court found that the water rights, historically used to generate electric power at a site later inundated by the waters of Dillon Reservoir, had been abandoned and therefore "canceled" them.[1] We affirm.

## I.

At issue are water rights in three ditches, located in Summit County near the Dillon Dam and Reservoir, decreed for the sole beneficial use of generation of electric power. They consist of a 59 cubic feet per second ("cfs") right in the Straight Creek Ditch,[2] a 35 cfs right in the Swanson Mill Ditch[3] and a 160.14 cfs right in the Snake River Ditch[4] (collectively, "the water

1. The water court further found that the evidence was insufficient to quantify historical use, thereby preventing the court from developing terms and conditions that would avoid injury to other appropriators. The water court cited this as an additional reason for denying the Board's application for changes of water rights. Because we affirm the water court's determination of abandonment, it is unnecessary to consider whether the evidence of historical use was so deficient as to supply an independent basis to uphold the water court's judgment. See generally May v. United States, 756 P.2d 362, 371 (Colo. 1988) (where the inability accurately to quantify historical use prevents the water court from developing terms and conditions that will avoid injuring other appropriators, a change of water right must be denied).

2. The water court described the Board's Straight Creek Ditch water right as follows:

A. Straight Creek Ditch

i. The Straight Creek Ditch was decreed on March 2, 1910 in Civil Action 1277 in the Summit County District Court with an appropriation date of April 18, 1899 for 62.5 cfs.

ii. Decreed Point of Diversion: South bank of Straight Creek whence the southwest corner of Section 4, Township 5 South, Range 77 West of the 6th P.M. bears South 18[°] 30' West 2,650 feet in Summit County, Colorado.

iii. Source: Straight Creek, a tributary of the Blue River.

iv. Decreed use: Generation of electric power.

v. The Applicant owns 59 cfs of this power right.

vi. Three and one-half (3.5) cfs of the water right decreed to the Straight Creek Ditch was transferred to the Town of Dillon and changed in Case No. W–12 to municipal uses subject to the terms and conditions of that decree.

3. The water court described the Board's Swanson Mill Ditch water right as follows:

B. Swanson Mill Ditch

i. The Swanson Mill Ditch was decreed on March 2, 1910 in Civil Action No. 1277 by the Summit County District Court with an appropriation date of June 30, 1899 for 35 cfs.

ii. Decreed Point of Diversion: South bank of Straight Creek whence the southwest corner of Section 4, Township 5 South, Range 77 West of the 6th P.M. bears South 18[°] 30' West 2,650 feet in Summit County, Colorado.

iii. Source: Straight Creek, a tributary of the Blue River.

iv. Decreed Use: Generation of electric power.

v. The Applicant owns 35 cfs of this power water right.

4. The water court described the Board's Snake River Ditch water right as follows:

C. Snake River Ditch

i. The Snake River Ditch was decreed on March 2, 1910 in Civil Action No. 1277 by the Summit County District Court with an appropriation date of October 11, 1899 in the amount of 160.74 cfs.

ii. Decreed Point of Diversion: North bank of Snake River whence the North quarter (N ¼) corner, Section 9, Township 5 South, Range 76 West of the 6th P.M. bears North 21[°] 10' East 1,725 feet in Summit County, Colorado.

iii. Source: Snake River, a tributary of the Blue River.

rights"). Each has an 1899 appropriation date. The Straight Creek and Swanson Mill ditches have their decreed points of diversion on Straight Creek, a tributary of the Blue River. Straight Creek enters the Blue River from the east a short distance below Dillon Dam. The Snake River Ditch has its decreed point of diversion on the Snake River, a tributary of the Blue River. The Snake River flows into Dillon Reservoir from the east.

For many years, the water rights were put to their decreed use—generation of electric power—to operate the Summit Hydro Plant ("the old power plant"), owned by Public Service Company of Colorado. In December 1959, however, Public Service Company permanently shut down the plant. In February 1960, the Board purchased the old power plant and its water rights from Public Service Company. Later that year the Board dismantled the old power plant to make way for the Dillon Dam and Reservoir, which was completed in 1963.

The Board did not seek permission from the federal government to construct a new power plant in the Dillon area until twenty-four years after the water rights were last used to generate power at the old power plant and twenty-one years after completion of the Dillon Dam. In February 1984, the Board requested an exemption from licensing from the Federal Energy Regulatory Commission, which would allow it to construct a new power plant on the Dillon Dam and Reservoir at a location different from that of the old power plant.[5] The Board's request was granted in August 1984. Construction began in 1986, and the Board began generating electricity at the

new power plant on October 1, 1987. The water rights have never been used to produce power at the new power plant.

The water rights were placed on the July 1984 Abandonment List by the Division Engineer for Water Division No. 5.[6] Later, the Board and the Division Engineer agreed, as the water court found, "that the water rights would be deleted from the Abandonment List if [the Board] would file [an application for change of water rights]."

The Board filed its application for change of water rights on December 19, 1986, more than two years after it had obtained the exemption from licensing so that it could build the new power plant. In its application, the Board requested approval for alternate points of diversion that would allow the Board to use the water rights to generate power at the new power plant. The appellees opposed the application on grounds that the Board had abandoned the water rights and that the changes sought by the Board could not be granted without injuring other appropriators.[7]

After conducting a three-day trial beginning June 7, 1988, the water court issued a written judgment and decree on September 7, 1988, containing detailed findings of fact and conclusions of law, and denying the Board's application. The water court found that the Board had not used the water rights since acquiring them in 1960, a twenty-nine year period of non-use. The court held that this long period of non-use without adequate justification created a presumption of abandonment. The court further held that the Board had not rebut-

iv. Decreed Use: Generation of electric power.

v. The Applicant owns 160.14 cfs of this power right and conveyed 0.6 cfs of said water right to the Loveland Pass Motel.

5. Robert W. Fischer, the Board's water resource development officer, testified that the Board applied to the Federal Energy Regulatory Commission for a "preliminary permit" "about 1982," "right in that neighborhood."

6. Under the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602, 15 C.R.S. (1973 & 1989 Supp.), the division engi-

neer of each water division must prepare a quadrennial tabulation of all water rights and conditional water rights in the engineer's division. § 37–92–401(1), 15 C.R.S. (1989 Supp.). Additionally, under § 37–92–402(1), the division engineer was required to prepare an abandonment list reflecting "any water rights or conditional water rights which the division engineer determines to have been abandoned in part, and [omitting] any water rights or conditional water rights which the division engineer determines have been totally abandoned."

7. The Division Engineer for Water Division No. 5 did not file a statement of opposition.

ted the presumption, and consequently that the water rights had been abandoned.

## II.

█ The principles of law governing the issue of abandonment are well-established. A water right can be terminated by abandonment. *People v. City of Thornton*, 775 P.2d 11, 17 (Colo.1989); *Masters Inv. Co., Inc. v. Irrigationists Ass'n*, 702 P.2d 268, 271–72 (Colo.1985); *Sieber v. Frink*, 7 Colo. 148, 154, 2 P. 901, 904 (1883). "Abandonment of a water right" is defined in the Water Right Determination and Administration Act of 1969[8] as "the termination of a water right in whole or in part as a result of the intent of the owner thereof to discontinue permanently the use of all or part of the water available thereunder." § 37–92–103(2), 15 C.R.S. (1973); *see, e.g., Farmers Reservoir & Irrigation Co. v. Fulton Irrigating Ditch Co.*, 108 Colo. 482, 487, 120 P.2d 196, 199 (1941) (basing a similar definition on common law principles). Intent is the critical element in determining abandonment. *Masters*, 702 P.2d at 271–72; *Beaver Park Water, Inc. v. City of Victor*, 649 P.2d 300, 302 (Colo. 1982). The requisite intent need not be proved directly but may be inferred from all the circumstances of the case. *Southeastern Colorado Water Conservancy Dist. v. Twin Lakes Assoc., Inc.*, 770 P.2d 1231, 1237 (Colo.1989); *Beaver Park*, 649 P.2d at 302.

█ Continued and unexplained nonuse of a water right for an unreasonable period of time creates a rebuttable presumption of intent to abandon. *Thornton*, 775 P.2d at 18; *Twin Lakes*, 770 P.2d at 1237; *Hallenbeck v. Granby Ditch & Reservoir Co.*, 160 Colo. 555, 567, 420 P.2d 419, 426 (1966). The amount of time considered to be "unreasonable" will necessarily vary with the facts of each case. *Thornton*, 775 P.2d at 18; *Twin Lakes*, 770 P.2d at 1238; *cf.* § 37–92–402(1), (11), 15 C.R.S. (1973 & 1989 Supp.) (for purpose of preparing division engineer's 1978 abandonment tabulation,

ten year period of nonuse when needed created rebuttable presumption of abandonment).

█ The presumption of abandonment shifts the burden of going forward to the water right owner to introduce enough evidence to rebut the presumption. *Thornton*, 775 P.2d at 18; *Masters*, 702 P.2d at 272. "[T]o rebut the presumption of abandonment arising from [a] long period of nonuse, there must be established not merely expressions of desire or hope or intent, but some fact or condition excusing such long nonuse." *Thornton*, 775 P.2d at 18 (quoting *Mason v. Hills Land & Cattle Co.*, 119 Colo. 404, 408–09, 204 P.2d 153, 156 (1949)); *accord Twin Lakes*, 770 P.2d at 1238. The existence of excuse for a long period of nonuse is not independently significant but is relevant in determining the owner's intent. *Thornton*, 775 P.2d at 18. Statements of intent by the owner of water rights, in the absence of other evidence, are insufficient to rebut the presumption of abandonment. *Twin Lakes*, 770 P.2d at 1238; *Beaver Park*, 649 P.2d at 302.

█ Abandonment of a water right must be established by a preponderance of the evidence. *Thornton*, 775 P.2d at 19; *Masters*, 702 P.2d at 272. Resolution of the issue of abandonment often involves conflicting evidence of nonuse and intent, and therefore the water court must determine this issue by weighing all the evidence and assessing the credibility of the witnesses. *Twin Lakes*, 770 P.2d at 1238; *Masters*, 702 P.2d at 272. The weight to be assigned to the evidence is for the water court to decide. *See Masters*, 702 P.2d at 272. "Because abandonment is a question of fact depending on the particular circumstances of each case, the water court's resolution of the factual issues presented will not be disturbed on appeal unless the evidence is wholly insufficient to support the decision." *Thornton*, 775 P.2d at 19; *accord Twin Lakes*, 770 P.2d at 1239; *Masters*, 702 P.2d at 272; *Beaver Park*, 649

---

**8.** The Water Right Determination and Administration Act of 1969 is found at §§ 37–92–101 to

–602, 15 C.R.S. (1973 & 1989 Supp.).

P.2d at 302. When the foregoing principles are applied to the evidence in the present case, we are persuaded that the water court's finding of abandonment must be affirmed.

### III.

■ We begin by reviewing the evidence before the water court on the issue of abandonment. The evidence established that the water rights had not been put to use from the time Public Service Company of Colorado shut down the old power plant in December 1959 until the date of trial, a period of about twenty-nine years. The water court ruled that "the long period of non-use, coupled with the absence of justification for such non-use, created a presumption of abandonment." It then went on to determine whether the presumption had been rebutted. The evidence presented on the issue of the Board's intent was not extensive, and the trial court made specific findings as to much of it.

### A.

The Board presented evidence that it obtained a Special Use Permit from the United States Forest Service dated December 4, · 1962, and amended September 5, 1963, allowing it to construct a ditch on public lands for the purpose of diverting water around the Dillon Dam and Reservoir while the dam was being built and to construct another ditch for the purposes of supplying water to Dillon and diverting water from Straight Creek into the Dillon Reservoir. The first ditch apparently involved a realignment of the Snake River Ditch and the second, a realignment of the Straight Creek Ditch.

The permit contained a proviso requiring that the Board obtain written approval from the Forest Service before transporting water in the newly-authorized ditches. As the water court noted, the evidence showed that the Board "had never sought or received approval for the transmission of water through the ditch." [9] The permit

superseded special use permits designated "Summit County Power Company; Conduit and Transmission lines, 9/23/07, 2/3/11, 10/24/12, 4/14/17," and, as the water court found, "was more restrictive than the previous permits given to Summit County Power which allowed the conveyance of water for the generation of electrical energy."

### B.

The Board also offered evidence that on two occasions it had transferred portions of the water rights acquired from Public Service Company of Colorado to third parties. On July 27, 1960, shortly after the Board acquired the water rights, it agreed to convey 0.6 cfs of its Snake River Ditch water right and an easement in the Snake River Ditch to Hans Hansen, the owner of the Loveland Pass Motel. The agreement between the Board and Hansen states in pertinent part:

> Whenever, in the utilization of its portion of the water rights decreed to the Snake River Ditch, it becomes necessary for the Board to operate said ditch, it shall do so in such a manner as not to interfere with Hansen's rights in the ditch.

In accordance with the Board–Hansen agreement, the Board executed a special warranty deed on July 27, 1960, conveying the 0.6 cfs water right in the Snake River Ditch and the ditch easement to Hansen. The deed included the statement that the Board "has found, determined and declared, by appropriate resolution, that the above bargained rights are neither useful for nor required in the Denver Municipal Water Works operation."

On August 18, 1971, more than fifteen years before the filing of the application for change of water rights at issue here, the Board agreed to convey 3.5 cfs of its Straight Creek Ditch water right to the Town of Dillon, to be used for municipal purposes only. Paragraph 12 of the agreement states that "it is necessary to the

---

9. Charles Smith, the Board's acting property manager, testified that at the time of trial approval had not yet been sought for construction of the realigned ditches by submitting plans and specifications to the Forest Service.

Board's future operation of the Straight Creek Ditch that any [of Dillon's] plans for laying a pipeline within or beneath the Straight Creek Ditch right-of-way shall not conflict or hinder the Board's proposed future use." Paragraph 13 adds that "[t]he Board may at any time enlarge the Straight Creek Ditch to provide for the Board's uses." On October 3, 1973, the Board granted Dillon a license to install a raw water pipeline "within and across" the Straight Creek Ditch right-of-way.

■ Diligent efforts to sell a water right are evidence of intent not to abandon. *See Thornton,* 775 P.2d at 19–22; *Beaver Park,* 649 P.2d at 302–03. In this case, however, the Board did not make diligent efforts to sell the water rights. Only two sales were shown by the evidence. Regarding the sale to Hansen of 0.6 cfs of the Board's Snake River Ditch right, the uncontroverted evidence established that the Board sold Hansen this water right in response to Hansen's claim that the Board, in drilling the Roberts Tunnel, had caused his well to run dry. As to the transfer to Dillon of 3.5 cfs of the Board's Straight Creek Ditch right, the agreement providing for that transfer reflects that it was arrived at in settlement of litigation between the Board and Dillon involving a number of issues.[10] There is no evidence or contention that the Board sought to sell any other portions of the water rights.

### C.

The Board presented additional evidence that on December 27, 1978, the Board, Dillon, and Dillon Valley Water and Sanitation District agreed to participate in creating a diversion dam and intake structure on Straight Creek. Although there was conflicting evidence whether the structure had any relation to the water rights at issue in this case, the water court determined, in the exercise of its fact-finding function, that the diversion structure was constructed for use in connection with water rights other than the ones at issue here, specifically the Board's "Straight Creek Conduit Unit granted to [the Board] in Case Nos. 1529, 1548 and 2371." The water court found and concluded, therefore, that the diversion structure "is not relevant to the question of abandonment because it involves a completely separate water right decreed for other purposes."

### D.

The Board's evidence established that on February 19, 1976, January 17, 1977, May 24, 1977, and November 21, 1980, the Board entered into licensing agreements with Keystone International. Each of these agreements authorized Keystone to construct a condominium complex across the Board's Snake River Ditch right-of-way. The water court found that these agreements, although relevant, were all entered into by the Board to protect its interest in the real property involved, and were not sufficient to show non-abandonment of the water rights. The water court also noted that by the terms of the 1962 Special Use Permit, the Snake River Ditch was "not to be used for the conveyance of water for the generation of electrical energy." Language in paragraph 4 of each of the licensing agreements reserved the Board's right "to make full use of the property involved as may be necessary or convenient in the operation of the water plant and system under the control of the Board," and each agreement also provided that "[a]t no time shall Licensee interfere with the flow of water in Board facilities."[11]

---

10. In addition to the evidence contained in the agreement itself, Robert Fischer, one of the Board's witnesses at trial, testified that the Board *traded*—not sold—this right to Dillon.

11. It appears that the Board does not intend to use the Snake River Ditch to carry water to the new power plant. Robert Fischer, the Board's water resource development officer, testified as a witness for the Board. On direct examination, Fischer testified that in connection with the Snake River Ditch right "there is no facility that needs to be constructed." On cross-examination, the following exchange took place:

Q You indicated in your testimony that there are no facilities that need to be constructed to use the Snake River power plant right at the proposed new place of use; is that correct?

A I think that's right, yes.

Q Okay.

This language provides some support for an inference that the Board did not intend to abandon the water rights at issue.[12] The water court recognized this but, in its role as fact-finder, determined that this evidence, when taken together with the other evidence in the case, was insufficient to rebut the presumption of abandonment.

## E.

The Board's evidence included a June 23, 1982, letter written by an engineer employed by the Board to an attorney concerning his client's interest in purchasing some of the Board's rights in the Snake River Ditch, in which the author offered the following explanation for the refusal to sell: "The portion of the canal adjoining your clients [sic] property is owned by the Water Board in Fee Simple Title *and is used to convey water to the Loveland Valley Motel.* It is therefore not possible to relinquish any of the Water Board's rights in this parcel of land." (Emphasis added.) The letter gives no indication of the Board's intent not to abandon the water rights.

## IV.

The evidence established a presumption of abandonment based on a long period of unexcused nonuse. The water rights have not been used since 1959 when the old power plant was shut down. Even though Dillon Dam was completed in 1963, no efforts were made to obtain approval for and build a new power plant until the early 1980s.

We agree with the water court that this extended period of unexplained nonuse created a rebuttable presumption of abandonment. The only evidence tending to rebut the presumption of abandonment was limited and inconclusive. The water court held it insufficient to rebut the presumption.

"As in most judicial inquiries into the state of mind of a particular person, the question of the intent of an owner of a water right is essentially a question of fact for determination by the trier of fact on the basis of the evidence produced at trial." *Masters,* 702 P.2d at 272. "When, as most often occurs, the record contains conflicting evidence on the issue of intent to abandon, the water court's final determination of this issue will rarely be overturned by this court." *Id.* When faced with conflicting evidence in the record on the issue of abandonment, we have held consistently over the years that "the finding of the facts as to the intent of the owners with respect to the abandonment of the ditch and water rights [is] peculiarly within the province of the trial court and under elementary rules its conclusions as well as the judgment based thereon may not, with propriety, be disturbed by us." *Scott v. Temple,* 108 Colo. 463, 466, 119 P.2d 607, 608 (1941); *accord Masters,* 702 P.2d at 272–73. The water court's ruling that the Board had not overcome the presumption of abandonment is entitled to the same deference shown by us in the past in affirming water court findings on the issue of abandonment. *See, e.g., Masters,* 702 P.2d 268 (affirming water court's finding that water rights had been abandoned); *Twin Lakes,* 770 P.2d 1231 (same); *Thornton,* 775 P.2d 11 (affirming water court's finding that evidence rebutted presumption of abandonment); *Beaver Park,* 649 P.2d 300 (same). The evidence was sufficient to support the water court's ruling that the Board had abandoned the water rights.

## V.

The water court made careful and detailed findings of fact and conclusions of

A It can be done.
Q So, I take it, that you don't—Denver doesn't need any of the easements associated with that old historic Snake River right in connection with the proposed new use?
A I think that would be right once we're set up to do that.
The alternate point of diversion requested for the Snake River Ditch water right was on Dillon Dam. The clear import of this evidence is that water obtained by exercise of the Snake River Ditch water right would be left in the Snake River and not diverted until it reached the Dillon power plant. The Board appears to acknowledge this in its briefs.

12. *But see* n. 11, above.

law, fully supported by the record, and determined that the water rights had been abandoned. We affirm the judgment of the water court.

VOLLACK, J., dissents, and ROVIRA and MULLARKEY, JJ., join in the dissent.

Justice VOLLACK dissenting:

I respectfully dissent from the majority's holding affirming the judgment of the District Court, Water Division No. 5 (the water court), denying the application for certain changes of water rights filed by the City and County of Denver, acting by and through its Board of Water Commissioners (the Board). In my opinion the evidence considered by the water court was sufficient to overcome the presumption that the Board had abandoned its rights in the waters in question. Therefore I would hold that the water court abused its discretion in holding that the evidence did not overcome the presumption of abandonment.

Because I would hold that the water court abused its discretion in concluding that the evidence did not overcome the presumption of abandonment, I address the issue of whether the water court erred in holding that the inability to quantify historical use of the water rights prevented the court from developing terms and conditions which would avoid injury to other appropriators. I would hold that the water court's holding on this point was also an abuse of discretion.

I.

A.

At trial the Board and the objector-appellees presented evidence on the issue of whether the Board had abandoned the subject water rights. The evidence at trial established that on December 4, 1962, the Board received a Special Use Permit from

the United States Department of Agriculture and the United States Forest Service. The permit gave the Board permission to use a ditch ten feet wide to convey water through the Snake River Ditch and the Straight Creek Ditch.

The evidence at trial also established that on July 27, 1960, the Board conveyed 0.6 cubic feet per second (c.f.s.) of its Snake River Ditch water right to Hans Hansen, the owner of the Loveland Pass Motel. On August 18, 1971, the Board conveyed to the town of Dillon (Dillon) 3.5 c.f.s. of the Board's 62.5 c.f.s. Straight Creek water right.[1] The agreement effecting the 1971 conveyance stated that "[t]he [Dillon Valley] District agrees not to protest any application filed by [Dillon] to change the use of the right deeded by the Board to [Dillon] ... from its decreed use [generation of electric power] to a municipal year-round use." Dillon agreed to convey to the Board water rights identified as the "Dillon Enlargement," decreed in the amount of 25 c.f.s., and the "Meadow," decreed in the amount of 23.3 c.f.s.

In 1978 the Board, Dillon, and the Dillon Valley District agreed to share the cost of constructing a diversion dam and intake structure on Straight Creek. At trial Mr. Robert Fischer testified for the Board that the project involved the construction of a pipeline following the right of way of the old Straight Creek Ditch. The project was authorized by a permit issued by the Summit County Board of County Commissioners (the Summit County Board).

The Board presented evidence at trial that during the 1970s it protected its water rights in the Snake River Ditch and the Straight Creek Ditch through a series of license agreements. On October 3, 1973, the Board authorized Dillon to construct and operate a 16-inch water pipeline in the Board's Straight Creek Ditch property. In a 1976 license agreement the Board authorized Keystone International to construct a

---

**1.** In the agreement the Board conveyed 3.5 c.f.s. of its Straight Creek water right to Dillon. The Board also agreed to withdraw protests in other pending water cases in the water court. The Dillon Valley Water and Sanitation District (the Dillon Valley District) agreed to seek only to

change 3.5 c.f.s. of the "Rankin No. 1 Ditch" to year-round municipal use. Under the agreement, Dillon and the Dillon Valley District agreed to share the 7 c.f.s. the agreement gave them "as if jointly owned and held," upon a set of terms and conditions.

condominium complex within and across the Board's Snake River Ditch property. On May 24, 1977, and November 21, 1980, the Board authorized Keystone to construct and operate a condominium complex within and across the same property. Each of these agreements stated that "[t]he term 'property' ... refers to real property and includes easements, rights-of-way and other Board interests in land." In each of these agreements the Board reserved "the right to make full use of the property involved as may be necessary or convenient in the operation of the water plant and system under the control of the Board." The agreements also stated that "[a]t no time shall Licensee interfere with the flow of water in Board facilities and Licensee shall assume all risks incident to the presence of water in Board facilities."

The Board also offered into evidence a June 23, 1982, letter from the head of the Denver Water Department. The letter was in answer to an inquiry by a Mr. Barry Rothman about the possible sale by the Board of some of its interest in the Snake River Ditch. The letter referred to a provision in agreements between the Board and landowners along the Snake River Ditch which protected the Board's interest in the ditch and ensured that the ditch would remain available to the Board to carry water for waterworks purposes.

In 1984 the Board applied for an exemption from licensing of a hydroelectric project in Dillon Dam. The Federal Energy Regulatory Commission granted the exemption on August 20, 1984.

### B.

During the trial the Board submitted into evidence a 1987 Denver Water Department study (the Department study) of the historical use of the subject water rights based on Public Service Company power generation records from the Summit Hydro Plant (the old power plant). The study included charts of the average daily flow rates, in cubic feet per second, of water from the Snake River and Straight Creek Ditches to the old power plant. Appendix B of the study contained Straight Creek Ditch stream flows in cubic feet per second recorded by the United States Geological Survey.

After the trial the Board submitted proposed findings of fact and conclusions of law. The proposed findings of fact included the statement that "[t]he water diverted under the subject priorities will continue to be used for the generation of electric power, which is a non-consumptive use." The proposed findings also contained a stipulation enforcing the 1971 agreement between the Board, the Dillon Valley District, and Dillon subordinating up to 7 c.f.s. of the Board's Straight Creek water right. The proposed decree also stated that the proposed diversions would be discontinued, and "the ditch abandoned and rendered nonfunctional subject to the rights of Hans Hansen or his assigns to divert .6 cfs, pursuant to agreement dated July 27, 1960." The Board's proposed decree set out monthly maximum flow rates for the Board's proposed diversions. The maximum flow rates were based on the Department study's estimates of maximum monthly stream flow rates into the old power plant. The Board's proposed decree limited the Board's right to place calls on the Blue River or Ten Mile Creek to meet the needs of the subject water rights, but did not restrict the Board's right to place calls on Straight Creek or Snake River upstream of the original points of diversion to satisfy the subject water rights. The proposed decree also contained the following provision:

> This court shall retain jurisdiction in this proceeding to consider the question of injury to the vested water rights of others as provided in C.R.S. § 37–92–304(6), 15 C.R.S. (1986 Supp.). At any time within a five year period commencing on the date of this decree but not thereafter, any person may request a hearing by this Court for such purposes and for modification of the decree only as to the reconsideration by the Court on the question of injury to the vested rights of others.

At trial both sides presented evidence on the issue of whether it was possible for the

water court to enter a decree which protected other appropriators from injury. Edwin James, a water rights engineer for the Board, testified that because power generation was a non-consumptive use the change sought by the Board would not injure water users located downstream of Dillon Dam. The Snake River Water District called Mr. Harold Bishop, the president of a consulting firm, as an expert witness. Mr. Bishop testified on cross-examination that if the Board were allowed to place a call on the Snake River upstream of the historic diversion point for the old power right, that call would injure decreed water rights. Mr. Bishop also testified to several shortcomings in the Department study which minimized the possibility that the change in water rights sought by the Board would not injure the decreed water rights of others.[2] However, Mr. Bishop testified that the Dercum Ditch water right was the only right located above the historic point of diversion, and that it would not be affected by a decree identifying the Snake River Ditch priority as a 1946 priority. Mr. Bishop also testified that virtually all the other water rights owned by the Snake River Water District were below the historic point of diversion and would not be subject to call if the decree limited the Board to utilizing the water right at the historic point of diversion.

The water court concluded that "there is an inability to accurately quantify the historic use of the subject power rights," and therefore it could not "develop terms and conditions that would avoid injury to other appropriators." The water court based this conclusion on several findings. The court noted that "[t]here were no water diversion records regarding the subject power rights." The water court found that the existence of an auxiliary stream generating unit capable of generating power at the equivalent of 21.2 c.f.s. of water diversions undermined the Board's estimated stream flow rates, which were based on the old power plant's electrical output. The court also found several inconsistencies in the power production records upon which the Department study was based. The court referred to the fact that the records indicated diversions in excess of the 48.6 c.f.s. capacity of the power plant penstock. The court also referred to an admitted 10 percent discrepancy in the conversion formula. Finally, the court noted that the diversion to the Loveland Pass Motel may have consumed as much as 10 c.f.s. in order to transport the motel's 0.6 c.f.s. The court cited *May v. United States*, 756 P.2d 362 (Colo.1988), for the proposition that "[w]here the inability to accurately quantify historic use prevents the court from developing terms and conditions that avoid injury, a change of water rights must be denied."

## II.

I agree with the majority's conclusion that the evidence was sufficient to establish a rebuttable presumption that the Board had abandoned the water rights. Maj. op. at 779. I disagree, however, with the majority's conclusion that the evidence rebutting the presumption of abandonment was "limited and inconclusive." Maj. op. at 779. I would hold that the water court abused its discretion in holding that the evidence of the Board's sales to Dillon and the Loveland Pass Motel, the Board's licensing agreements, and the June 23, 1982, letter did not overcome the presumption of abandonment.

Once the evidence at trial establishes a rebuttable presumption of abandonment, the burden of going forward shifts to the

---

**2.** Mr. Bishop testified that, assuming the Department study accurately reported stream flows into the old power plant, several conditions would be required to prevent injury to other appropriators. First, the amount of the decree would have to be reduced by the amounts conveyed by the Board to Dillon and the Loveland Pass Motel. Second, the decreed amounts for the new points of diversion would have to be based on average rather than maximum stream flow rates into the old power plant. Third, the stream flow rates estimated in the Department study would have to be reduced by 10 percent to account for admitted discrepancies in the study. Finally, any call on the Snake River would have to be limited to 70 percent of the decreed water right because the Department study assumed that 70 percent of the water flowing into the old power plant came from the Snake River.

owner of the water right, "who may then introduce evidence sufficient to rebut the presumption established by non-use." *Southeastern Colorado Water Conservancy Dist. v. Twin Lakes Assocs.*, 770 P.2d 1231, 1237 (Colo.1989) (quoting *Beaver Park Water, Inc. v. City of Victor*, 649 P.2d 300, 302 (Colo.1982)). "In order to rebut a presumption of abandonment it is necessary to adduce evidence that the water right owner did not intend to abandon the water right notwithstanding the long period of nonuse that gave rise to the presumption." *People v. City of Thornton*, 775 P.2d 11, 18 (Colo.1989). Mere expressions by the water right owner of a desire or hope to retain the water right are insufficient to rebut a presumption of abandonment. *Id.; Mason v. Hills Land & Cattle Co.*, 119 Colo. 404, 408–09, 204 P.2d 153, 156 (1949). The water right owner must present evidence of facts or conditions excusing the period of non-use. *Thornton*, 775 P.2d at 18; *Twin Lakes*, 770 P.2d at 1238. As we explained in *Thornton*, 775 P.2d at 18, however, the existence of an excuse for non-use is not independently significant but is relevant to the determination of the owner's intent. "Thus, evidence sufficient to show that during the period of nonuse the owner never intended to discontinue permanently the use of the water available under the water right will rebut the statutory presumption of abandonment." *Id.* The question of whether an owner of a water right intended to abandon that right is "essentially a question of fact for determination by the trier of fact on the basis of the evidence produced at trial." *Masters Investment Co., Inc. v. Irrigationists Ass'n*, 702 P.2d 268, 272 (Colo. 1985).

### A.

The majority concludes that the evidence that the Board twice conveyed portions of its water rights to third parties does not establish that the Board was making diligent efforts to sell the water rights. In my opinion the Board's sale of part of its water rights to Dillon and the Loveland Pass Motel indicates that the Board believed it had water rights to sell. Our precedents establish that water rights sales are persuasive evidence of an intent not to abandon water rights.

In *People v. City of Thornton*, 775 P.2d at 19–20, we considered whether the water court erred in holding that the evidence at trial overcame a rebuttable presumption that the owners of certain water rights had abandoned those rights. In *Thornton* we upheld the water court's finding that the water rights in question had not been abandoned. We relied on the subjective declarations of the water rights owners, which were only sufficient to support our decision because they were supported by evidence that on two occasions the water rights owners had attempted to sell the two wells at issue in the case. *Id.* at 20. We stated that "[a]ctual good faith efforts to sell a water right ... are strongly indicative of absence of intent to abandon and provide objective evidence of the intent that a water right not be abandoned." *Id.* at 21. In *Thornton* we held that "the totality of the evidence of the water rights owners' testimony, the documentary evidence of attempts to sell the water rights, and the testimony of counsel for a potential purchaser are sufficient to support the water court's finding that there was never any intent to abandon the ... water rights." *Id.*

In the present case the Board did more than merely engage in good faith efforts to sell parts of its water rights. The Board actually succeeded in conveying parts of its water rights to Dillon and the owner of the Loveland Pass Motel. *See Beaver Park*, 649 P.2d at 302–03 (holding that evidence consisting largely of the leasing, sale and mortgaging of the water rights at issue was sufficient to rebut a presumption of abandonment arising from a twenty-year period of non-use). The Board's 1960 and 1971 sales indicate that the Board did not intend to abandon its unsold water rights in the Snake River and Straight Creek ditches. In my opinion the water court's failure to recognize the Board's expression of intent not to abandon its remaining water rights in the Snake River and Straight Creek ditches was an abuse of discretion.

## B.

The majority concludes that although the evidence of the Board's licensing agreements with Keystone provide some support for an inference that the Board did not intend to abandon the water rights at issue, the water court was within its discretion as fact-finder to reject that inference. Maj. op. at 778–779. In my opinion the fact that the Board entered into the licensing agreements indicates that in doing so it intended to protect the water rights in the rights of way covered by the agreements. In each of the agreements the Board reserved the right to make full use of the rights of way involved for the operation of "the water plant and system under control of the Board." The agreements also stated that "[a]t no time shall Licensee interfere with the flow of water in Board facilities."

The Board's entry into these licensing agreements in the 1970s is analogous to the "constant activity" on the part of the water rights owner in *Beaver Park*, 649 P.2d at 303. In *Beaver Park* we upheld the water court's finding of non-abandonment on the basis of activity of the water rights owner, including the owner's and others' entry into lease and mortgage arrangements, negotiations undertaken by the owner about the sale of the subject water rights, and other activities indicative of the owner's intent not to abandon the water rights. *Id.* at 302–03. Inferences drawn from the licensing agreements support the Board's intent not to abandon the subject water rights.

## C.

The June 23, 1982, letter introduced into evidence by the Board also established the Board's intent not to abandon the subject water rights. One of the Board's witnesses testified that the letter was from the head of the Denver Water Department and advised Barry Rothman that the Board did not intend to offer a portion of the Snake River Ditch for sale. The letter also advised Mr. Rothman that the Board had "entered into agreements with land owners along the [Snake River Ditch] for the use of portions of the [ditch] where the . . .

Board only had a right-of-way." The letter referred to the following provision in those agreements:

> If the Board requires the use of the easement for water works purposes, Licensee agrees, solely at its own expense and in a manner and at a location acceptable to the Board, to install a conduit or other water carrying facility capable of transporting the decreed water rights of the [Snake River Ditch], and convey to the Board an acceptable right-of-way for the water carrying facility.

While it is true the agreements appear to have only protected the Board's rights of way in the Snake River Ditch, the fact that the Board was careful to preserve its rights of way for "other water works purposes" indicates that the Board did not intend to abandon its rights in the water which travelled through the Snake River Ditch. *See Beaver Park*, 649 P.2d at 302–03.

I respectfully dissent from the majority's decision to affirm the water court's conclusion that the Board failed to overcome the presumption of abandonment. The Board's evidence of its sales of parts of its water rights in the Snake River Ditch and the Straight Creek Ditch, the various licensing agreements entered into by the Board, and the 1982 Denver Water Department letter overcame the presumption of abandonment created by the period of non-use. *Thornton*, 775 P.2d at 21; *Beaver Park*, 649 P.2d at 302–03.

## III.

Because the majority affirms the water court's determination of abandonment, it does not consider whether the evidence of historical use was so deficient as to supply an independent basis to uphold the water court's judgment. Maj. op. at 774 n. 1. Because I believe that the water court abused its discretion in holding that the Board did not overcome the presumption of abandonment, I address the issue presented by the water court's holding that it could not quantify historical use of the water rights and therefore could not develop terms and conditions which would avoid

injury to other appropriators. In my opinion the water court's holding that it could not quantify historical use, or develop terms to avoid injury to other appropriators, was an abuse of discretion.

## A.

Before the water court may grant an application for a change of water right, the applicant must establish that the proposed change will not injuriously affect the vested rights of other water users. §§ 37–92–304(3) & 37–92–305(3), 15 C.R.S. (1974 & Supp.1989); *May,* 756 P.2d at 370. "[T]he right to change a point of diversion is limited in quantity by historical use at the original decreed point of diversion." *Orr v. Arapahoe Water and Sanitation Dist.,* 753 P.2d 1217, 1223 (Colo.1988). " 'Historical use' as a limitation on the right to change a point of diversion has been considered to be an application of the principle that junior appropriators have vested rights in the continuation of stream conditions as they existed at the time of their respective appropriations." *Weibert v. Rothe Bros.,* 200 Colo. 310, 317, 618 P.2d 1367, 1372 (1980); *see Orr,* 753 P.2d at 1223 (the requirement of non-injury protects the vested rights of junior appropriators to the continuation of stream conditions existing at the time of the respective appropriations). "Where expansion of use is the injury asserted, establishment of historical use is the burden of the applicant." *Weibert,* 200 Colo. at 317, 618 P.2d at 1372. Historical use is measured by the amount of water applied to a beneficial use and the amount to return flow. *May,* 756 P.2d at 371; *Danielson v. Kerbs Ag., Inc.,* 646 P.2d 363, 373 (1982). The water court may not grant an application for a change in water right if the change will increase the historical use to the detriment of other appropriators. *May,* 756 P.2d at 371.

Subsection 37–92–305(3) requires the water court to offer applicants an opportunity to propose terms or conditions which will prevent the injurious effects which would otherwise follow from the change in water rights requested by the applicant. *See Weibert,* 200 Colo. at 316, 618 P.2d at 1371.

The applicant has the burden to present a plan which will prevent or compensate injury to other appropriators. *May,* 756 P.2d at 372.

## B.

I would hold that in this case the water court's rejection of the Board's proposed decree was supported by inadequate findings of fact. The water court relied on *May v. United States,* 756 P.2d at 373, to support its holding that its inability to quantify historical use of the subject water rights prevented it from developing terms and conditions which would avoid injury to other appropriators. In *May* the appellants applied for a conditional decree for storage of 462 acre-feet of water in an unnamed basin. *Id.* at 365. Objectors to the application claimed that the proposed storage and use of water in the unnamed basin would alter the rate, timing, and quantity of diversions from Rock Creek, the source of supply. *Id.* at 366. The court found that based on the historical uses of the water rights involved there were less than 284.15 acre-feet of water available for the proposed project, which would demand 384 acre-feet. *Id.* at 367. The water court therefore determined, based on the total historical use demonstrated by the applicant that it would not be possible to grant the application without injuring other appropriators. *Id.* The court rejected the applicant's proposed order to avoid injury because the order assumed an availability of water "far in excess of the amount determined by the [c]ourt to be available." *Id.* at 373. In *May* we affirmed the order of the water court on the ground that the water court's inability to accurately calculate the maximum historical use of the applicant's wells prevented the water court from granting the application subject to terms and conditions that would avoid injury to other appropriators. *Id.*

Our holding in *May* does not mean that in every case in which it is difficult to quantify historical use the water court must deny the application for change of water rights. The underlying reason to quantify historical use is to protect the vested rights of junior appropriators. *Orr,*

753 P.2d at 1223; *Weibert*, 200 Colo. at 317, 618 P.2d at 1372. If the evidence establishes that the water court might be able to protect the vested rights of other users without calculating historical use with mathematical certainty, then the water court must address that possibility in its findings of fact. *See Southeastern Colorado Water Conservancy Dist. v. Fort Lyon Canal Co.*, 720 P.2d 133, 147 (Colo. 1986) (water court failed to enter specific, detailed factual findings of the various quantities and ways that applicants would diminish or change patterns of historical consumptive use and return flows).

The evidence in the present case indicated that it may have been possible for the water court to enter a decree which protected other appropriators from injury. The application in the present case stated as a proposed term and condition to prevent injury to other water users that the Board "will divert water only when and to the extent it is feasibly and legally available at the original points of diversion." Edwin James testified that the Board's planned non-consumptive use of the water would not injure downstream appropriators. Harold Bishop testified for the Snake River Water District to injury to decreed water rights that a change in water rights might cause. However, Mr. Bishop also identified a series of conditions which would ensure that the change in water rights did not exceed the historical use at the historic point of diversion. *See supra* at 774, n. 2. Mr. Bishop also testified that upstream users would not be injured if the decree limited the Board to utilizing the water rights at the historic point of diversion.

The Board's proposed decree stated that "[t]he Snake River Ditch priority shall be administered with the same priority (June 24, 1946) as the Board's Blue River Diversion Project which was decreed in C.A. Nos. 1805 and 1806 on March 10, 1952." The Board's proposed decree also protected the appropriations of the town of Dillon up to 7 c.f.s., and protected the 0.6 c.f.s. previously conveyed by the Board to Hans Hansen. Therefore the evidence at trial indicated that the change in water rights would not necessarily injure other appropriators, and that it might be possible for the water court to issue a decree which would prevent or compensate injury to other appropriators. Given the evidence introduced at trial the water court issued inadequate findings of fact to support its holding that, because of its inability to quantify the historical use of the water rights, it could not issue a decree which did not injure other appropriators.

I respectfully dissent from the majority holding affirming the water court's determination that the Board failed to overcome the presumption of abandonment. I also believe that the water court abused its discretion in concluding that it could not quantify historical use and could not avoid injury to other appropriators. I would reverse the water court's order that the Board has abandoned its water rights and remand the case to the water court for further proceedings.

I am authorized to say that Justice ROVIRA and Justice MULLARKEY join in this dissent.